**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GEORGE KALMAN                           :        CIVIL ACTION
                                        :
        v.                              :
                                        :
PEDRO A. CORTES, et al.                 :        NO. 09-684

**MEMORANDUM RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Baylson, J.                                              June 30, 2010

**Table of Contents**

I.      Introduction..................................................................................................................2

II.     Background...................................................................................................................3
        A.      Procedural History............................................................................................3
        B.      Parties' Contentions.........................................................................................4

III.    Legal Standard..............................................................................................................5

IV.     The Blasphemy Statute..................................................................................................7
        A.      Brief History of Blasphemy Jurisprudence......................................................7
                1.      Blasphemy Laws in Britain..................................................................7
                2.      Blasphemy Laws in America................................................................8
                        a.      Early Blasphemy Convictions Pre-1st Amend..................8
                        b.      Blasphemy Cases Post-1st Amend....................................11
        B.      The Blasphemy Statute's Origins....................................................................13
        C.      Application of the Blasphemy Statute..............................................................16
        D.      Plaintiff Kalman's Application.........................................................................19
        E.      The Bureau Amends the "Revised List" of Suspect Words..............................22

V.      Discussion...................................................................................................................23
        A.      The Establishment Clause................................................................................23
                1.      The Lemon Test...................................................................................26
                        a.      Purpose.............................................................................27
                        b.      Effect................................................................................34
                        c.      Entanglement....................................................................35
        B.      Freedom of Speech..........................................................................................40
                1.      Commercial Speech.............................................................................41

|  |  | a. | Central Hudson Test | 46 |
|  |  |  | i. Prong One | 47 |
|  |  |  | ii. Prong Two | 47 |
|  |  |  | iii. Prong Three | 47 |
|  |  |  | iv. Prong Four | 49 |
|  | 2. | Non-Commercial Speech | | 51 |
|  |  | a. | Expressive Speech | 51 |
|  |  | b. | Viewpoint-Based Regulation | 54 |
|  |  | c. | Speech Forum Doctrine | 62 |

VI.     Conclusion...................................................................................................66

## I.     Introduction

Blasphemy, which is generally defined as the act of insulting or showing contempt or a lack of reverence for God or something considered sacred, is a religious concept which has existed for thousands of years.  As an example, in the Judeo-Christian tradition, blasphemy appears in the Bible in Leviticus 24, where the unnamed son of an Israelite mother and Egyptian father who blasphemed the Lord was brought before Moses, and whose punishment was stoning and death.  Other books of the Bible describe the ruthless Babylonian king, Nebuchadnezzar, as a serial blasphemer.  Continuing as a religious concept in music and literature, the very same Nebuchadnezzar, with the Italian name "Nabucco" in Verdi's opera, not only denounces God, but declares himself a deity.  See Theodore L. Gentry, Nabucco 1842, in Encyclopedia of the Romantic Era, 1760-1850 781, 781 (Christopher John Murray ed., 2003) ("Nabucco appears, places the Crown on his own head, and declares that he is a God.  The Hebrews are shocked by the blasphemous act . . . .").  Decades later, the Nobel Prize-winning Irish playwright George Bernard Shaw irreverently wrote:  "All great truths begin as blasphemies."  Annajanska, The Bolshevik Express (1918).

In the present case, Plaintiff George Kalman commenced this action challenging the

constitutionality of Section 1303(c)(2)(ii) of Title 15 of the Pennsylvania Consolidated Statutes

(the "Blasphemy Statute"), which prohibits corporate names containing "[w]ords that constitute

blasphemy, profane cursing or swearing or that profane the Lord's name."  Plaintiff asserts that

the Blasphemy Statute violates the Establishment Clause and Free Speech Clause of the First

Amendment to the United States Constitution.  Plaintiff, who sought to name his film company

"I Choose Hell Productions LLC," challenges the statute both on its face and as applied, seeking

a declaratory judgment that it violates his constitutional rights, a permanent injunction

prohibiting Defendant from enforcing it against Plaintiff or anyone else, and an award of actual

damages and attorney's fees.  Presently before the Court are the parties' Cross Motions for

Summary Judgment, and no material facts are disputed by the parties.  For the reasons discussed

below, Plaintiff's motion will be granted, and Defendant's motion will be denied.

## II.    **Background**

### A.    **Procedural History**

On February 18, 2009, Plaintiff Kalman filed his Complaint (Doc. No. 1) against

Defendant Pedro A. Cortes, Secretary of the Commonwealth of Pennsylvania, in his official

capacity, seeking a declaratory judgment that the Blasphemy Statute violates the First and

Fourteenth Amendment to the United States Constitution, a permanent injunction prohibiting

enforcement of the Blasphemy Statute, and an award of actual damages and attorney's fees.[1]  On

April 16, 2009, Defendant Cortes filed a Motion to Dismiss for Improper Venue (Doc. No. 4), to

---

[1]Although the Complaint also noted the addition of "Doe" Defendants as employees of the
Pennsylvania Department of State, the parties have not done anything about this designation, and the
Court sees no reason that any additional defendants are necessary.

which Plaintiff responded on May 13, 2009 (Doc. No. 6).  On July 23, 2009, the Court held Oral

Argument on Defendant's Motion to Dismiss, and on July 28, 2009, issued an Opinion and Order

denying the motion.  (Kalman v. Cortes, 646 F. Supp. 2d 738 (E.D. Pa. 2009) (Baylson, J.).)  On

August 10, 2009, Defendant Cortes filed his Answer (Doc. No. 13) to Plaintiff's Complaint.  The

parties then engaged in and completed extensive discovery.

On December 21, 2009, both parties filed Cross Motions for Summary Judgment (Doc.

Nos. 17, 21).  On December 24, 2009, an amici curiae brief was filed in support of Plaintiff by

the Jewish Social Policy Action Network, the Unitarian Universalist Association, the Rev. Larry

W. Smith, and the Rev. Nathan Walker (Doc. No. 23.)  Regarding Plaintiff's summary judgment

motion (Doc. No. 21), Defendant Cortes responded on January 19, 2010 (Doc. No. 25), and

Plaintiff replied on February 8, 2010 (Doc. No. 30).  Regarding Defendant's summary judgment

motion (Doc. No. 17), Plaintiff responded on January 19, 2010 (Doc. No. 26), and Defendant

replied on February 8, 2010 (Doc. No. 29).  Oral Argument was held on the cross motions for

summary judgment on April 1, 2010.  Having been fully briefed and argued, the motions are now

ripe for disposition.

### B.   Parties' Contentions

Plaintiff Kalman argues that the Blasphemy Statute is unconstitutional under the First and

Fourteenth Amendments to the United States Constitution, and asks the Court to permanently

enjoin both Defendant and Pennsylvania's Department of State from enforcing it.  Plaintiff

argues that the Blasphemy Statute violates the Establishment Clause because it has a non-secular

purpose, its principal or primary effect advances religion, and it fosters an excessive government

entanglement with religion.  Plaintiff also argues that the Blasphemy Statute violates the Free

Speech Clause because it discriminates on the basis of viewpoint, constitutes an unconstitutional prior restraint on speech, and is unconstitutionally vague.

Defendant Cortes argues that the Blasphemy Statute does not violate the Establishment Clause because its purpose and effect is to protect the public from offensive, indecent, and profane expression, and because there is no excessive government entanglement with religion. Defendant also argues that the Blasphemy Statute is constitutional because it is appropriately tailored to serve the legitimate end of regulating commercial speech.  In the alternative, Defendant argues that the Blasphemy Statute is constitutional under the Free Speech Clause because it governs speech in a non-public forum and is both reasonable and viewpoint neutral, because it addresses unprotected classes of speech, namely, obscenity and profanity, and because it is not unconstitutionally overbroad or vague.

## III.   Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  This same standard applies when there are cross motions for summary judgment.  See Princeton Ins. Co. v. Converium Reinsurance (N. Am.) Inc., 344 Fed. Appx. 759, 761 (3d Cir. 2009); see also Se. Pa. Transit Auth. v. Pa. Pub. Util. Comm'n, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993) ("The standards for granting or denying summary judgment do not change by virtue of cross-motions being presented.").

An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual

dispute is "material" if it might affect the outcome of the case under governing law.  Id.  A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  After the moving party has met its initial burden, the adverse party's response must "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

"When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard."  Marciniak v. Prudential Fin. Ins. Co. of Am., 184 Fed. Appx. 266, 270 (3d Cir. 2006).  If review of the cross motions reveals no genuine issue of material fact, then judgment may be "entered in favor of the party deserving judgment in light of the law and undisputed facts."  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

IV.    **The Blasphemy Statute**

The information set forth below and throughout the remainder of this opinion comes from publicly available sources and from the discovery taken in this case and supplied to the Court by the parties.  See Fed. R. Civ. P. 56.

A.    **Brief History of Blasphemy Jurisprudence**

1.    **Blasphemy Laws in Britain**

Prohibitions on blasphemy predate the American Revolution, existing in Britain as early as 1648, when the British Parliament passed an ordinance providing that an individual convicted of one of several acts of blasphemy "shall suffer the pains of death."  An Ordinance for the Punishing of Blasphemies and Heresies, 1648 (Eng.), Acts and Ordinances of the Interregnum, 1642–1660 (C.H. Firth & R.S. Rait eds., 1911), available at http://www.british-history.ac.uk/report.aspx?compid=56264 (last visited May 18, 2010).  The "Blasphemies and Heresies" described in this ordinance were limited to profaning the Christian God; for example, the ordinance prohibited "Preaching, Teaching, Printing or Writing, Maintain[ing] or publish[ing]" that the Holy Trinity[2] "are not one Eternal God," or that "Jesus Christ is not the Son of God."  Id.  The law was enforced against numerous individuals, including George Fox, founder of the Society of Friends,[3] James Nayler, a prominent Quaker leader, and William Penn,

_____

[2]"The traditional Christian doctrine of the Trinity is commonly expressed as the claim that the one God 'exists as' Father, Son, and Holy Spirit, or as the claim that there are three divine persons 'in' God, or as the claim that God 'exists in three Persons.'"  Stanford Encyclopedia of Theology, available at http://plato.stanford.edu/entries/trinity/ (last visited May 18, 2010).

[3]"Quakers are members of the Religious Society of Friends, a faith that emerged as a new Christian denomination in England during a period of religious turmoil in the mid-1600's, and is practiced today, in a variety of forms, around the world.  To members of this religion, the words 'Quaker' and 'Friend' mean the same thing."  Quaker Information Center, available at http://www.quakerinfo.org/ (last visited May 20, 2010).

founder of Pennsylvania.[4]

As early as 1675, British courts expressly recognized Christianity as comprising English law.  That year, John Taylor was convicted of uttering various "blasphemous expressions," including that he was Christ's younger brother, that "Christ is a whoremaster," and that "religion is a cheat."  Taylor's Case, 1 Ventis 293, 86 Eng. Rep. 189, 189 (1676).  Justice Matthew Hale, writing for the Court of King's Bench in Taylor's Case, explained that "wicked blasphemous words were not only an offense to God and religion, but a crime against the Laws, State and Government, and therefore punishable in this Court," because "Christianity is a parcel of the laws of England; and therefore to reproach the Christian Religion is to speak in subversion of the law."  Id.  British courts, however, clarified that the blasphemy prohibition only extended to "Christianity," which is the "established law of the country," and did not protect Judaism, Islam, or "any sect of the Christian religion, except the [Anglican] form established by law," including the Catholic Church.  Regina v. Gathercole, 2 Lewin 237, 168 Eng. Rep. 1140, 1146 (1838).

> **2.** **Blasphemy Laws in America**
>
> > **a.** **Early Blasphemy Convictions Prior to the Incorporation of the First Amendment[5]**

Britain's prohibition on blasphemy was also enforced on American soil.  The Massachusetts Bay Colony hanged four Quakers for blasphemy in 1659-1660, and prosecuted numerous individuals accused of blasphemy in the infamous Salem witch trials of the 1690s.  See

---

[4] See Thomas Burton, 1 Diary of Thomas Burton, 152–58, 265-66 (John T. Rutt ed., 1828); Hans Fantel, William Penn:  Apostle of Dissent 101 (William Morrow & Co., 1974).

[5] For a more detailed background on American blasphemy cases from the Nineteenth-Century, see University of Pennsylvania Law Professor Sarah Gordon's article entitled "Blasphemy and the Law of Religious Liberty in Nineteenth-Century America."  52 Am. Q. 682 (2000).

Rufus M. Jones, The Quakers in the American Colonies 76-80 (MacMillan & Co., 1923).  Even

after the American Revolution and the drafting of the Bill of Rights, which asserted freedom of

religion, blasphemy prohibitions remained.  As the Supreme Court has explained,

> [m]ost of the States that had ratified the Constitution by 1792 punished the related crime of blasphemy or profanity despite the guarantees of free expression in their constitutions, and Massachusetts expressly prohibited the "Composing, Writing, Printing or Publishing, of any Filthy Obscene or Prophane Song, Pamphlet, Libel or Mock-Sermon, in Imitation or in Mimicking of Preaching, or any other part of Divine Worship."  Acts and Laws of Massachusetts Bay Colony (1726), Acts of 1711-1712, c. 1, p. 218.

Paris Adult Theatre I v. Slaton, 413 U.S. 49, 104 (1973); see also Roth v. United States, 354 U.S.

476, 482-483 (1957) ("Thirteen of the 14 States provided for the prosecution of libel, and all of

those States made either blasphemy or profanity, or both, statutory crimes." (internal footnote

omitted)).  The First Amendment, including its provisions concerning religion, had not yet been

incorporated to apply to the States.

In People v. Ruggles, 8 Johns. 290 (N.Y. Sup. Ct. 1811), one of the most famous

blasphemy cases in the United States, the New York State Supreme Court affirmed the

blasphemy conviction of John Ruggles, a man who had shouted "Jesus Christ was a bastard, and

his mother must be a whore" while at the door of a tavern after drinking heavily.  Id. at 291.

Ruggles' attorney argued that unlike English law, New York common-law did not prohibit

Ruggles from making blasphemous statements because the Constitution "allows a free toleration

to all religions and all kinds of worship," and that Christianity had not been made part of the law

of New York.  Id.  Chief Judge Kent rejected these arguments, instead determining that "[t]he

people of this State, in common with the people of this country, profess the general doctrines of

Christianity," and "the case assumes we are a Christian people, and the morality of the country is

deeply ingrafted upon Christianity and not upon the doctrines or worship of . . . imposters." Id.

Notwithstanding the "expressions in the constitution," Chief Judge Kent concluded that Ruggles'

blasphemous statement, which had been made "with a wicked and malicious disposition, and not

in a serious discussion upon any controverted point in religion," constituted an "abuse" of the

right to "free and decent discussion on any religious subject." Id. at 293.  The Ruggles Court,

therefore, affirmed that "'Christianity in general' described the boundaries of religious liberty in

the new American republic," just as it had been embodied in British common-law.  Sarah B.

Gordon, Blasphemy and the Law of Religious Liberty in Nineteenth–Century America, 52 Am.

Q. 682, 684 (2000).

The Ruggles decision was by no means an outlier.  Various other state courts joined the

New York Supreme Court in finding Christianity to be part of state common-law.  Over a decade

after Ruggles, the Pennsylvania Supreme Court affirmed that blasphemy remained a common-

law crime under Pennsylvania law in Updegraph v. Commonwealth, 11 Serg. & Rawle 394 (Pa.

1824).  In that case, during a debating society's debate about religion, the defendant, Updegraph,

stated that "the Holy Scriptures were a mere fable, that they were a contradiction, and that,

although they contained a number of good things, yet they contained a great many lies."

Although the Pennsylvania Supreme Court reversed Updegraph's conviction on other grounds,

the Court noted that "Christianity, general Christianity, is, and always has been, a part of the

common law of Pennsylvania," and that finding to the contrary would carry away "restraints

upon civil liberty."  Id. at 399.  In addition, the high courts in Delaware and Massachusetts

upheld blasphemy convictions, reasoning that Christianity had been incorporated as part of their

common-law.[6]  Blasphemy convictions continued through the early Twentieth Century.[7]

**b.      Blasphemy Cases After the Incorporation of the First Amendment**

Blasphemy case law dramatically changed after the Supreme Court unanimously held in

Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), that under the Due Process Clause of the

Fourteenth Amendment, the States could not violate individual rights guaranteed by the First

Amendment, including the "constitutional inhibition of legislation on the subject of religion."  In

particular, Justice Roberts' opinion in Cantwell provided that

> [i]n the realm of religious faith, and in that of political belief, sharp differences arise.  In both fields, the tenets of one man may seem the rankest error to his neighbor.  To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.  But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

Id. at 310.

Following Cantwell, the Supreme Court then held in Joseph Burstyn, Inc. v. Wilson, 343

---

[6]See Commonwealth v. Kneeland, 37 Mass. 206, 213 (Mass. 1838) (finding that "blasphemy may be described, as consisting in speaking evil of the Deity with an impious purpose to derogate from the divine majesty, and to alienate the minds of others from the love and reverence of God"); State v. Chandler, 2 Del. 553 (Del. 1837) ("We know, not only from the oaths that are administered by our authority to witnesses and jurors, but from that evidence to which every man may resort beyond these walls, that the religion of the people of Delaware is christian." (emphasis in original)).

[7]See, e.g., State v. Mockus, 120 Me. 84 (Me. 1919) (affirming blasphemy conviction under Maine law, and rejecting the defendant's arguments that his conviction was unconstitutional); Jersey Law Triumphant:  Reynolds Found Guilty of Blasphemy, N.Y. Times, May 21, 1887, available at http://query.nytimes.com/mem/archive-free/pdf?_r=1&res=9501 E5DC1730E633A25752C2A9639C94669FD7CF (last visited May 15, 2010) (reporting on the blasphemy conviction of Charles Reynolds under New Jersey law, who had distributed a pamphlet purportedly "casting reproach on the Christian religion").

U.S. 495 (1952), that a New York statute authorizing state officials to censor "sacrilegious" films unconstitutionally abridged the rights to free speech and free press.  Even though the New York Court of Appeals had construed the statute as being designed to protect all religions, 101 N.E. 2d 665, 672 (N.Y. 1951), Justice Clark's opinion for the Court emphasized that "New York cannot vest such unlimited restraining control over motion pictures in a censor," because "[u]nder such a standard[,] the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another," 343 U.S. at 505.  Although Justice Clark's opinion did not discuss blasphemy, Justice Frankfurter's concurring opinion explained that

> [i]f "sacrilegious" bans more than the physical abuse of sacred persons, places, or things, if it permits censorship of religious opinions, which is the effect of the holding below, the term will include what may be found to be "blasphemous."  England's experience with that treacherous word should give us pause, apart from our requirements for the separation of Church and State. . . . Blasphemy was the chameleon phrase which meant the criticism of whatever the ruling authority of the moment established as orthodox religious doctrine.

Id. at 528-29; see further discussion of Burstyn below.

After Burstyn, it appears the only appellate court decision addressing a blasphemy statute is Maryland v. West, 263 A.2d 602 (Md. Ct. Spec. App. 1970), in which a truck driver, Irving West, was convicted of disorderly conduct, resisting arrest, and blasphemy after getting into a fight and stating:  "Get your goddam hands off me."  Constitutional Law:  Damning Blasphemy, Time, May 16, 1969, available at http://www.time.com/time/magazine/article/0,9171,902576,00.html (last visited May 18, 2010).  West was convicted of violating Maryland's blasphemy statute, which provided as follows:

> If any person, by writing or speaking, shall blaspheme or curse God, or shall write or utter any profane words of and concerning our Saviour Jesus Christ,

-12-

> or of and concerning the Trinity, or any of the persons thereof, he shall on conviction be fined not more than one hundred dollars, or imprisoned not more than six months, or both fined and imprisoned as aforesaid, at the discretion of the court.

West, 263 A.3d at 603. The Maryland Court of Special Appeals rejected the state's argument that this statute had a "secular aura" by protecting "those citizens who desire to worship to carry on unmolested." Id. at 604. Instead, the Court determined that the blasphemy statute under which West had been convicted "remains in substantially the same form as its predecessor statutes," and has "historical roots . . . embedded in the firm conviction of its original and subsequent framers that legislative fiat was necessary and desirable to preserve the sanctity of the Christian religion." Id. at 603. The Court held that "[p]atently, the statute was intended to protect and preserve and perpetuate the Christian religion in this State," and such an "effort . . . to extend [the state's] protective cloak to the Christian religion or to any other religion is forbidden by the Establishment and Free Exercise Clauses of the First Amendment." Id. at 605. Thus, by the time the present case was commenced, American courts had already rejected the notion that Christianity was part and parcel of American common-law, and had clarified that statutes intended to protect Christianity over other religions run afoul of the First Amendment.

**B.       The Blasphemy Statute's Origins**

In June 1977, the Pennsylvania Legislature enacted the Blasphemy Statute, adding it to Title 15, Section 1303 of the Pennsylvania Consolidated Statutes, the statute governing corporate names for domestic business corporations in Pennsylvania.[8] The Blasphemy Statute mandates

---

[8]The statute governing corporate names for non-profit corporations in Pennsylvania contains an identical prohibition. See 15 Pa.C.S. § 5303(c)(2)(ii). This requirement is also applicable to limited liability partnerships (via 15 Pa.C.S. § 8203), limited partnerships (via 15 Pa.C.S. § 8505), and limited liability companies (via 15 Pa.C.S. § 8905).

that no corporate name in Pennsylvania shall contain "[w]ords that constitute blasphemy, profane cursing or swearing or that profane the Lord's name."  15 Pa.C.S. § 1303(c)(2)(ii).

As the parties to this case recognize, the legislative history regarding the creation and passage of the Blasphemy Statute is sparse.  Indeed, the Pennsylvania House and Senate journal entries do not reflect recorded discussion on the merits of the legislation upon final passage, the House Bill merely restates the language of the statute,[9] and the "History of House Bills and Resolutions" of the Pennsylvania House of Representatives defines the Blasphemy Statute simply as "[a]n Act amending the 'Business Corporation Law,' [as] approved [on] May 5, 1933 (P.L. 364, No. 106), prohibiting the use of blasphemous or obscene words in the corporate name."[10]  This evidence is, ultimately, the extent of the surviving legislative history pertaining to the Blasphemy Statute.

Nevertheless, newspaper articles published both when the Blasphemy Statute was initially introduced and later signed into law shed light on the historical and factual context in which the statute arose.  Apparently, the Blasphemy Statute was introduced in response to a McKeesport, Pennsylvania businessman's incorporation of a gun store named "The God Damn Gun Shop."[11]

---

[9] See Pa. House Bill 371, Session of 1977, P.N. No. 405.  House Bill 371 of the 1977 Session of the General Assembly of Pennsylvania includes only one sentence regarding the implementation of the blasphemy portion of the statute, which merely restates the language of the statute; the only difference being the addition of a comma after the word "swearing."  See id.  Thus, House Bill 371 reads as follows: "The corporate name shall not contain words that constitute blasphemy, profane cursing or swearing, or that profane the Lord's name."  Id.

[10] See Vincent F. Scarcelli, History of House Bills and Resolutions, Sessions of 1977 and 1978 Final Issue, A-51.

[11] The New York Times reported that the "God Damn Gun Shop" was a mail-order fire-arms dealer.  Samuel G. Freedman, A Man's Existentialism, Construed As Blasphemy, N.Y. Times, Mar. 21, 2009, at A14.

After churches complained to their local representative, Rep. Emil Mrkonic, Rep. Mrkonic

introduced the Blasphemy Statute in the Pennsylvania legislature.  As reported by The

Philadelphia Inquirer:

> The Pennsylvania House has passed a bill that would make it illegal to use
> "God damn" in a corporate name.  The bill, which passed by a vote of 193-1,
> . . . . was prompted by the incorporation of a business in western
> Pennsylvania, listed as "The God Damn Gun Shop."  There is no law to
> prevent that now.  The lawyer who filed the papers of incorporation
> explained that the name developed from a comment made by the wife of the
> businessman who opened the store, who, when he left the house, would say,
> "I guess you're going to the God damn gun shop."  Numerous churches in
> the area objected to the shop's name and wrote to Rep. Emil Mrkonic (D.,
> Allegheny) who introduced the measure.

House Says No Damning, The Philadelphia Inquirer, Apr. 21, 1977, at 2-B.  The Gettysburg [Pa.]

Times also published an article covering the bill's introduction, attributed to the Associated

Press, stating:

> The House has passed and sent the Senate a bill banning blasphemous or
> obscene words in corporate names.  The measure, which went to the Senate
> Tuesday on a 193-1 vote, was a reaction to an incident in McKeesport two
> years ago.  An attorney for an unidentified gun store owner filed
> incorporation papers with the state, naming the store, "The God Damn Gun
> Shop."  Currently, the state has no power to prohibit such corporate names.
> . . . [T]he attorney who filed the incorporation papers [ ] said the wife of the
> businessman always said to her husband, "I guess you're going to the God
> damn gun shop."  The husband thought that was funny, so he had [the
> lawyer] file the incorporation papers.  Rep. Emil Mrkonic, D-Allegheny,
> who was bombarded by letters from protesting churches, didn't see the
> humor.  He first introduced his legislation last year . . . .

Would Ban Obscenity in Firm Names, The Gettysburg [Pa.] Times, Apr. 20, 1977, at 18.

After the Blasphemy Statute was passed into law in June 1977, numerous local and

national newspapers reported on its passage, all of which recited bits and pieces of the same set

of facts previously reported by The Philadelphia Inquirer and The Gettysburg Times.  See, e.g.,

<u>Shop Name Too Profane</u>, The Tuscaloosa [Al.] News, June 19, 1977, at 2C; <u>Wife Gets Last Word</u>, Sarasota [Fl.] Journal, June 17, 1977, at 5-C; <u>Law Bans Use of Profanity</u>, The Reading [Pa.] Eagle, June 16, 1977, at 39; <u>On The Light Side</u>, Lewiston [Me.] Evening Journal, June 16, 1977, at 25; <u>Profanity Barred From Firm Names</u>, The Gettysburg [Pa.] Times, June 15, 1977, at 11.

### C.   **Application of the Blasphemy Statute**

Responsibility for enforcing the Blasphemy Statute rests with the Business Processing Section of the Corporation Bureau of the Pennsylvania Department of State (the "Bureau"). Although the Blasphemy Statute itself does not define its terms, Secretary Cortes has, as part of discovery in this case, provided the following definitions as those used by the Bureau in construing, interpreting, and applying the Blasphemy Statute:

- blasphemy (n) – irreverence toward God, religion, a religious icon or something considered sacred. <u>Cf.</u> Profanity (n) – obscene, vulgar or insulting language. Profanity is distinguished from mere vulgarity and obscenity by the additional element of irreverence toward or mistreatment of something sacred. <u>Black's Law Dictionary</u>, 8th edition (2004);

- profane (adj.) – irreverent to something held sacred. <u>Black's Law Dictionary</u>, 8th edition (2004);

- profanes (v) – to treat (something sacred) with abuse, irreverence or contempt; desecrate. <u>Webster's 9th New College Dictionary</u> (1986);

- cursing – 1(a), to call upon divine or supernatural power to send injury upon; (b) to execrate in fervent and often profane terms; 2, to use profanely insolent language against; blaspheme. <u>Webster's 9th New College Dictionary</u> (1986);

- swearing – to use profane or obscene language, curse. <u>Webster's 9th New Collegiate Dictionary</u> (1986);

- the Lord – no definition used, but common understanding includes God,

Jesus, Christ; also deities from all religions, Mohammed, Allah, Buddha. (Response No. 7 of Defendant's Responses to Plaintiff's First Set of Interrogatories.)

In applying the Blasphemy Statute to an application for incorporation, Bureau employees were to determine whether a corresponding "rejection code" applied to a desired corporate name. These "rejection codes" provide various reasons for Bureau employees to reject an application; Rejection Code 170, which pertains to the Blasphemy Statute, merely recites the language of the statute, stating: "170 - The entity name shall not contain words that constitute blasphemy, profane cursing or swearing or that profane the Lord's name." As explained more fully below, Bureau employees testified that they received no training, education, standards, or guidance with respect to applying Rejection Code 170.

In September 2005, Martha Brown, Assistant Counsel to the Bureau, created a list of "suspect words" (the "Original List") to assist Bureau employees when screening names for violations of the Blasphemy Statute. Ms. Brown testified that, on her own initiative, she "sat down and . . . gave . . . some thought as to . . . how the Bureau could realistically implement [the Blasphemy Statute]. And I did draw up a list of words to assist staff in flagging things that may or may not need to be rejected under the statute." (Brown Dep. 23:18-24:6, Oct. 29, 2009.) Ms. Brown's Original List contained twenty-three (23) "suspect" words, eighteen (18) of which were vulgarities with no apparent religious significance. The remaining five (5) words included "Christ," "damn," "God," "hell," and "Jesus."

When creating her Original List, Ms. Brown did not consult with anyone else or undertake any research regarding non-Christian religions, had not received any training or education regarding religion or religious denominations, and believed the word "Lord" in the

-17-

Blasphemy Statute was a reference to the Christian Lord or concept of God.  (Brown Dep. 13:13-13:16, 25-31.)  Although Ms. Brown shared her Original List of suspect words with Joy Drake, the Bureau employee who supervised the "reviewing clerks" – those Bureau employees responsible for reviewing incorporation applications – the Original List was not actually shared with any of the reviewing clerks.  (Brown Dep. 30:11-30:16, 35:4-35:18.)

In January 2006, Ms. Brown, again on her own initiative and without consulting anyone else, created a revised list of suspect words (the "Revised List"), and circulated her Revised List to Joy Drake and Ms. Drake's supervisor, Patricia Hegedus.  (Brown Dep. 32:7-34:23.)  The Revised List contained one new word ("bull"), as well as variations of several words on the Original List.  Like the Original List, the Revised List included the words "damn," "Christ," "God," "hell," and "Jesus."  The Revised List also included a statement at the bottom of the page which read that "[a]ny permutation of these words should be flagged for review as well as variations on the spelling of these words which would yield the same pronunciation."  Although created in January 2006, the Revised List was not given to the reviewing clerks until a meeting held sometime after July 2009.[12]  (Brown Dep. 35:12-35:24; Decker Dep. 30:18-32:19, Oct. 29, 2009.)

Ms. Brown testified that she does not know whether the name "I Choose Hell Productions LLC" violates the Blasphemy Statute, and acknowledged that some individuals might consider that name to be non-blasphemous.  (Brown Dep. 42:23-44:12.)  Ms. Brown further testified that while she does <u>not</u> consider "I Choose <u>God</u>" or "I <u>Reject</u> Hell" to be blasphemous, she stated that

---

[12]Thus, the Revised List was not distributed to Bureau reviewing clerks until a point in time after Plaintiff had submitted his initial application for incorporation, after his initial application was rejected, and after he had filed the present lawsuit.

"I Choose Hell" is potentially blasphemous not because of the inclusion of the word "hell," but because of the context in which the word is used, meaning, the use of "I Choose" along with the word "Hell."  (Brown Dep. 44:13-44:23; 48:17-49:2.)  In creating both her Original and Revised Lists, Ms. Brown did not intend that an application for incorporation containing one of the words on her lists should automatically be rejected as a violation of the Blasphemy Statute.  (Brown Dep. 36:8-37:4.)  Instead, Ms. Brown's intent was that "if a name contained one of those words[,] . . . it ought to be reviewed a little more closer in order to see whether or not it should be rejected . . . ."  (Brown Dep. 36:15-36:21.)  Ms. Brown testified that she did not give any instruction as to what such a review should entail, or what levels within the Bureau such a review should reach.  (Brown Dep. 36:22-37:4.)

### D. Plaintiff Kalman's Application

On September 26, 2007, Plaintiff George Kalman, an independent filmmaker based in Downingtown, Pennsylvania, applied to the Bureau for a Certificate of Organization under 15 Pa.C.S. § 8913.  Plaintiff sought to register his for-profit film production company in Pennsylvania under the name "I Choose Hell Productions LLC."  In selecting the name "I Choose Hell Productions LLC," Kalman sought to convey his personal philosophy that it is better to struggle through difficult times in life than to commit suicide.[13]  (Kalman Dep. 11:21-15:2, Nov.

---

[13]Kalman testified that the reasons he chose the name "I Choose Hell Productions LLC" were as follows:

> Well, [']I Choose Hell['] was . . . more or less a personal socialization that I've had since I was – since I can remember. . . . [M]y expression was really about, it was an anti suicide message, which is, if life is Hell, say everything is going wrong in your life and things aren't gelling the way you want, then it doesn't make sense to commit suicide, because you already own your own death.  No one is going to steal it from you.  So why take it early, basically.  So I Choose Hell was, you know, like I Choose Life, basically.

4, 2009.)

The Bureau rejected Kalman's application via letter dated October 1, 2007.  The rejection

letter indicated that Kalman's application was rejected pursuant to "Rejection Code 170," and

instructed Kalman to "please return this notice along with your corrected filing."  Subsequently,

on October 12, 2008, Kalman resubmitted his application, substituting the name "ICH

Productions LLC" for his original intended name.  The Bureau accepted Kalman's resubmitted

application, and registered Kalman's business under the name "ICH Productions LLC."  Kalman

uses the "ICH Productions LLC" name on corporate documents such as waivers and lease forms,

in the credits of the films that he produces, on any correspondence he sends to actors he employs,

and on any tax forms he may file.  (Kalman Dep. 27:15-28:16.)

Parke W. Decker was the Bureau's reviewing clerk who reviewed Kalman's initial

application.  Mr. Decker was one of seven reviewing clerks tasked with reviewing applications

for corporate names, all of whom were supervised by Joy Drake.  (Decker Dep. 11:10-11:15;

Drake Dep. 16:16-16:18, 20:1-20:10, Oct. 29, 2009.)  The process undertaken by Mr. Decker and

the other reviewing clerks when reviewing applications for incorporation included determining

whether any rejection codes applied to invalidate the application.  (Decker Dep. 15:7-20:8.)  If a

reviewer determined that an application was invalid, the reviewer would note the appropriate

rejection code in the Bureau's computer system, and the system would then generate an

appropriate rejection notice.  (Decker Dep. 59:3-60:23.)  While reviewing clerks like Mr. Decker

had discretion to accept or reject an application for incorporation without consulting Ms. Drake

(Drake Dep. 70:17-71:2), if a reviewing clerk was unsure about whether a proposed name might

---

(Kalman Dep. 12:9-12:22.)

be invalid, he or she might choose to solicit advice from Ms. Drake (Drake Dep. 42:13-43:9).

Mr. Decker testified that he was familiar with Rejection Code 170, and knew that the Bureau uses a rejection code for corporate names containing blasphemy, profane cursing or swearing, or that profane the Lord's name.  (Decker Dep. 20:18-21:17.)  Mr. Decker, in applying Rejection Code 170, understood the term "blasphemy" to mean taking the "Lord's name in vain" (Decker Dep. 26:1-26:12), and the term "Lord" with a capital "L" to refer <u>only</u> to the Christian God, the "God in my . . . Christian upbringing.  God, like God the father," (Decker Dep. 28:18-29:7).  Essentially, Mr. Decker interpreted and applied Rejection Code 170, and thus the Blasphemy Statute, by reference to his own Catholic upbringing and the standards of the Catholic religion.  (Decker Dep. 27:10-29:7, 40:4-40:9.)  Mr. Decker has never received any training or education regarding any religions other than Catholicism, and he does not know what might be considered blasphemous in any religion other than Catholicism.  (Decker Dep. 39:8-39:23.)

Mr. Decker testified that he does not remember reviewing Kalman's initial application or discussing it with his supervisor, but that he believes he likely rejected Kalman's initial corporate name "[b]ecause of the blasphemy reason" when he saw the word "Hell" in "I Choose Hell Productions LLC."  (Decker Dep. 50:7-54:5.)  Mr. Decker also testified that as of today, he would not know whether an application for incorporation that contains the words "I Choose Hell" is blasphemous, that he likely would <u>not</u> consider applications with the words "I Choose Heaven" or "I Choose <u>God</u>" to be blasphemous, and that he is unsure of whether the phrase "I Choose Satan" is blasphemous.  (Decker Dep. 54:17-57:7.)

Ms. Drake, Mr. Decker's supervisor, testified that she is "not really sure" as to the meaning of the term "blasphemy," but that she understands the term to have some sort of

religious connotation and to involve "[t]aking the Lord's name in vain." (Drake Dep. 40:1-40:13.) Ms. Drake further testified that she understood the term "Lord" with a capital "L" to refer to swearing against the Christian God, and that while "Lord" could apply to non-Christian deities, she had never seen it used in such a context. (Drake Dep. 41:18-42:12.) Ms. Drake has never received any training or education regarding any religions other than the Protestant religion, and does not know how to determine whether a word might be blasphemous to a non-Christian religion. (Drake Dep. 49:8-49:12, 51:10-51:15.) Ms. Drake testified that she does not consider the words "devil" or "Satan" to be blasphemous, but does consider the word "hell" to be blasphemous because it appeared on Ms. Brown's Revised List. (Drake Dep. 50:18-51:15.) Ms. Drake further testified that the only words she would consider to be blasphemous, to constitute profane cursing or swearing, or to profane the Lord's name are those words contained in Ms. Brown's Revised List. (Drake Dep. 49:18-50:14.)

Mr. Decker and Ms. Drake both testified that they did not receive any training with respect to applying either the Blasphemy Statute or Rejection Code 170. (Decker Dep. 21:23-22:3, Drake Dep. 21:22:-22:7.) Mr. Decker further testified that he was not provided with any written standards or guidelines regarding how either the Blasphemy Statute or Rejection Code 170 should be applied. (Decker Dep. 21:23-24:20.)

### E.     The Bureau Amends the "Revised List" of Suspect Words

On February 18, 2009, Plaintiff Kalman initiated this lawsuit, and on December 21, 2009, both parties filed motions for summary judgment. In the midst of briefing the summary judgment issues, Defendant notified the Court that, effective January 4, 2010, the Bureau, "in its discretion in implementing the [Blasphemy Statute]," "voluntarily removed the words 'Christ,'

'God,' 'hell' and 'Jesus' from its list of prohibited words in corporate names."  (Def.'s Response

to Pl.'s Mot. for Summary Judgment, at 3.)  Indeed, on January 4, 2010, the Bureau circulated an

internal memo, authored by Assistant Counsel Martha Brown and addressed to five reviewing

clerks, two legal assistants, Joy Drake (Chief, Business Processing Unit and Legal Assistant

Supervisor), Patricia Hegedus (Chief, Division of Business Processing, Certification and UCC),

and Richard K. House (Director, Corporation Bureau), which stated:

> You have been using a list of 24 words to assist with reviewing filings for
> compliance with the [Blasphemy Statute].  Effective immediately, the list
> has been revised to eliminate the words:  "Christ," "God," "hell" and
> "Jesus."  Please find attached the revised list, which is the same as the
> former list except for the elimination of these four words.

(Exhibit I. to Def.'s Response to Pl.'s Mot. for Summary Judgment.)

## V.    Discussion

### A.    The Establishment Clause

Plaintiff contends that the Blasphemy Statute violates the First Amendment's

Establishment Clause, which provides that "Congress shall make no law respecting an

establishment of religion."  U.S. Const. amend. I.  This prohibition is extended to the states by

virtue of the Fourteenth Amendment.  Wallace v. Jaffree, 472 U.S. 38, 49-50 (1985); Modrovich

v. Allegheny County, Pa., 385 F.3d 397, 400 (3d Cir. 2004).  The Establishment Clause prohibits

government from establishing a religion in the sense of "sponsorship, financial support, [or]

active involvement of the sovereign in religious activity."  Walz v. Tax Comm'n of N.Y., 397

U.S. 664, 668 (1970).  As the Supreme Court has explained, under the Establishment Clause,

"government may not promote or affiliate itself with any religious doctrine or organization."

County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 590 (1989).  The

Establishment Clause is not, as some might suggest, an anti-religion provision, but instead rests on the understanding that "a union of government and religion tends to destroy government and to degrade religion." <u>Engel v. Vitale</u>, 370 U.S. 421, 431 (1962).  The Establishment Clause "forbids <u>alike</u> the preference of a religious doctrine <u>or</u> the prohibition of theory which is deemed antagonistic to a particular dogma." <u>Edwards v. Aguillard</u>, 482 U.S. 578, 593 (1987) (emphasis in original).

The Supreme Court has articulated three separate tests for determining whether governmental action violates the Establishment Clause:  (1) the <u>Lemon</u> test, (2) the "endorsement test," and (3) the "coercion test." <u>Borden v. Sch. Dist. of Twp. of E. Brunswick</u>, 523 F.3d 153, 175 (3d Cir. 2008) (citing <u>Modrovich</u>, 385 F.3d at 400-01).  The <u>Lemon</u> test, set forth by the Supreme Court in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), is the predominant test used by courts when determining the constitutionality of a challenged state or governmental action under the Establishment Clause.  <u>See, e.g.</u>, <u>McCreary County, Ky. v. ACLU of Ky.</u>, 545 U.S. 844, 859 (2005); <u>Edwards</u>, 482 U.S. at 582-83; <u>Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.</u>, 587 F.3d 597, 604 (3d Cir. 2009); <u>Busch v. Marple Newtown Sch. Dist.</u>, 567 F.3d 89, 100 (3d Cir. 2009).  While <u>Lemon</u> remains the primary Establishment Clause test, the Supreme Court has, without discarding the <u>Lemon</u> test, set forth two related tests:  the "endorsement test," <u>see</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring), and the "coercion test," <u>see</u> <u>Lee v. Weisman</u>, 505 U.S. 577 (1992).  <u>Stratechuk</u>, 587 F.3d at 604 (stating that the Supreme Court has set forth the endorsement and coercion tests without discarding <u>Lemon</u>).  In

the present case, however, where neither the coercion test[14] nor the endorsement test[15] is

applicable, the Court will use the <u>Lemon</u> test to determine the Blasphemy Statute's

_____

[14] The coercion test, which "looks at whether the government is 'coerc[ing] anyone to support or participate in religion or its exercise,'" <u>Borden</u>, 523 F.3d at 175 n.18 (quoting <u>Lee</u>, 505 U.S. at 587), "focuses primarily on government action in public education and examines whether school-sponsored religious activity has a coercive effect on students," <u>Modrovich</u>, 385 F.3d at 400.  The Third Circuit has made clear that "[t]he [Supreme] Court has <u>not</u> applied its coercion test outside the public education context." <u>Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly</u>, 309 F.3d 144, 175 (3d Cir. 2002) (emphasis added).  Thus, in the present case, which occurs outside the public education context, the coercion test is not applicable, and the Court need not address it.

[15] The endorsement test, a variation of the <u>Lemon</u> test, was first set forth by Justice O'Connor in her concurrence in <u>Lynch</u>, 465 U.S. at 692 (O'Connor, J., concurring).  The endorsement test "dispenses with <u>Lemon</u>'s 'entanglement' prong and, combining an objective version of <u>Lemon</u>'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion." <u>Modrovich</u>, 385 F.3d at 401.  The endorsement test thus asks whether the government action has "the effect of communicating a message of government endorsement or disapproval of religion," <u>id.</u> (quoting <u>Lynch</u>, 465 U.S. at 692 (O'Connor, J., concurring)), and centers on the perceptions of the "reasonable observer" when viewing a religious display, <u>id.</u> (citing <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 778 (1995)).

While prior Third Circuit case law indicates that the endorsement test only applies in cases involving "religious displays on government property," <u>Modrovich</u>, 385 F.3d at 401 ("the 'endorsement' test modifies Lemon in cases involving religious displays on government property"), the Third Circuit has more recently indicated that the endorsement test <u>can</u> be used in other contexts.  <u>See, e.g.</u>, <u>Stratechuk</u>, 587 F.3d at 609 ("There is merit to [the] argument that this court has <u>not</u> limited the endorsement test to cases involving religious displays on government property." (emphasis added) (citing <u>ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ</u>, 84 F.3d 1471, 1486-87 (en banc) (applying endorsement test to challenge to student-led prayer at high school graduation))).  Nevertheless, the Third Circuit has used the endorsement test primarily in cases involving either tangible religious displays or public schools.  <u>See, e.g.</u>, <u>Stratechuk</u>, 587 F.3d 597 (3d Cir. 2009) (applying endorsement test to school district's policy regarding performance of celebratory religious music at school-sponsored events); <u>Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.</u>, 386 F.3d 514 (3d Cir. 2004) (applying both the endorsement test and the <u>Lemon</u> test in the context of private evangelism in public schools); <u>Modrovich</u>, 385 F.3d at 401 (applying both the endorsement test and the <u>Lemon</u> test to a challenge of a display of the text of the Ten Commandments on plaque affixed to county courthouse); <u>Freethought Soc'y of Greater Philadelphia v. Chester County</u>, 334 F.3d 247 (3d Cir. 2003) (applying both the endorsement test and the <u>Lemon</u> test to a religious display); <u>Tenafly</u>, 309 F.3d 144 (adopting the endorsement test to evaluate claim of selective discrimination against religious displays).  Thus, to paraphrase Judge Diamond, where the Blasphemy Statute in the present case "involves neither a tangible religious display nor public schools, [the Court does] not believe that the endorsement test is applicable." <u>Young v. Beard</u>, 2007 WL 339031, at *13 (E.D. Pa. Jan. 31, 2007) (refusing to apply endorsement test in context of a constitutional challenge to a prison's allowance of rehearsal time to religious bands prior to Sunday services, and instead, employing the <u>Lemon</u> test).  Accordingly, the Court will not apply it here.

constitutionality.

### 1.    The Lemon Test

Under the <u>Lemon</u> test, a state law or governmental action is constitutional only if it meets

three criteria:  (1) it must have a secular purpose, (2) its primary or principal effect can neither

advance nor inhibit religion, and (3) it does not foster an excessive government entanglement

with religion.  <u>Lemon</u>, 403 U.S. at 612-13; <u>Stratechuk</u>, 587 F.3d at 604; <u>Busch</u>, 567 F.3d at 100;

<u>ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.</u>, 84 F.3d 1471, 1483 (3d Cir. 1996) (en

banc).  The Supreme Court has explained that governmental action violates the Establishment

Clause if it fails to satisfy <u>any</u> of <u>Lemon</u>'s three prongs.  <u>Edwards</u>, 482 U.S. at 583.  As the Third

Circuit has made clear, while the <u>Lemon</u> test has been much maligned,[16] it remains good law, and

as such, courts are obligated to consider it.  <u>See</u> <u>Stratechuk</u>, 587 F.3d at 604 (citing criticisms of

<u>Lemon</u>, but reinforcing that it is "still good law"); <u>Freethought Soc'y of Greater Philadelphia v.</u>

<u>Chester County</u>, 334 F.3d 247, 257 n.4 (3d Cir. 2003) ("[Sitting] Supreme Court Justices have . .

. criticized <u>Lemon</u> . . . . However, since <u>Lemon</u> has not been explicitly overruled, we are bound

to follow [it]." (internal citations omitted)); <u>Black Horse Pike</u>, 84 F.3d at 1484 ("The <u>Lemon</u> test

---

[16]<u>See, e.g.</u>, <u>Lamb's Chapel v. Center Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (comparing <u>Lemon</u> to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried"); <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting) (stating that "<u>Lemon</u> has had a checkered career in the decisional law of this Court," and collecting opinions criticizing <u>Lemon</u>); <u>Allegheny</u>, 492 U.S. at 655-56 (Kennedy, J., concurring in part and dissenting in part) (stating that although he found the <u>Lemon</u> test useful in judging the constitutionality of holiday displays, he did "not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area"); <u>Comm. for Pub. Ed. & Religious Liberty v. Regan</u>, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting) (desiring to avoid "continuing with the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in <u>Lemon</u>" (citation omitted)).  Moreover, Justices Rehnquist, Scalia, and Thomas dissented from the denial of certiorari in <u>City of Elkhart v. Books</u>, criticizing the Seventh Circuit for "applying the oft-criticized framework set out in <u>Lemon</u>."  532 U.S. 1058, 1060 (2001).

has been the subject of critical debate in recent years, and its continuing vitality has been called

into question by members of the Supreme Court. . . . Nevertheless, <u>Lemon</u> remains the law of the

land, and we are obligated to consider it until instructed otherwise by a majority of the Supreme

Court.").

    Here, Plaintiff argues that the Blasphemy Statute fails all three of <u>Lemon</u>'s prongs, while

Defendant argues that the Blasphemy Statute meets all three of <u>Lemon</u>'s prongs.  The Court now

addresses each prong in turn.

**a.**    <u>**Purpose**</u>

    Under <u>Lemon</u>'s purpose prong, a court must invalidate a statute if it lacks "a secular

legislative purpose."  <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 314 (2000) (quoting

<u>Lemon</u>, 403 U.S. at 612).  "The touchstone for our analysis is the principle that the 'First

Amendment mandates governmental neutrality between religion and religion, and between

religion and nonreligion.'"  <u>McCreary</u>, 545 U.S. 844, 860 (2005) (quoting <u>Epperson v. Arkansas</u>,

393 U.S. 97, 104 (1968); <u>Everson v. Bd. of Ed. of Ewing Twp.</u>, 330 U.S. 1, 15-16 (1947)).  As

the Supreme Court has explained, "[w]hen the government acts with the ostensible and

predominant purpose of advancing religion, it violates that central Establishment Clause value of

official religious neutrality, there being no neutrality when the government's ostensible object is

to take sides."  <u>Id.</u> (citing <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day</u>

<u>Saints v. Amos</u>, 483 U.S. 327, 335 (1987)).  Further stated, "[m]anifesting a purpose to favor one

faith over another, or adherence to religion generally, clashes with the 'understanding, reached . .

. after decades of religious war, that liberty and social stability demand a religious tolerance that

respects the religious views of all citizens . . . .'"  <u>Id.</u> (quoting <u>Zelman v. Simmons-Harris</u>, 536

-27-

U.S. 639, 718 (2002) (Breyer, J., dissenting)).  By showing a purpose to favor religion, the government "sends the . . . message to . . . nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . .'" Id. (quoting Santa Fe, 530 U.S. at 309-10 (quoting Lynch, 465 U.S. at 688 (O'Connor, J., concurring))).

In applying Lemon's purpose prong, "it is appropriate to ask whether government's actual purpose is to endorse or disapprove of religion." Stratechuk, 587 F.3d at 604 (quoting Wallace, 472 U.S. at 56 (internal quotation omitted)).  Stated otherwise, the purpose prong "simply requires that the [government] articulate some legitimate secular purpose for [its action] . . . . [T]his is a 'low threshold,' and courts are generally deferential to the government's proffered secular purpose as long as it is legitimate." Modrovich, 385 F.3d at 411 (internal quotations and citations omitted) (emphasis in original).

Then again, while courts are "normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." Stratechuk, 587 F.3d at 604 (emphasis added) (quoting Edwards, 482 U.S. at 586-87 (1987)); see also McCreary, 545 U.S. at 864 ("[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective.") (citing Santa Fe, 530 U.S. at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference.  But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'")).  Indeed, the Supreme Court has rejected the idea that to satisfy the purpose prong, the government must identify merely "any" secular purpose:

> The dissent . . . maintains that the purpose test is satisfied so long as <u>any</u> secular purpose for the government action is apparent. [Such a conclusion] would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action. . . . [A]n approach that credits <u>any</u> valid purpose, no matter how trivial, has <u>not</u> been the way the [Supreme] Court has approached government action that implicates establishment."

<u>McCreary</u>, 545 U.S. at 865 n.13 (internal citation omitted) (emphasis added).  Several Courts of Appeals have reached similar conclusions.  <u>See</u> <u>Hall v. Bradshaw</u>, 630 F.2d 1018, 1020 (4th Cir. 1980) ("[T]he state cannot escape the proscriptions of the Establishment Clause merely by identifying a beneficial secular purpose.  The inquiry goes beyond this."); <u>DeSpain v. DeKalb County Cmty. Sch. Dist.</u>, 384 F.2d 836, 839 (7th Cir. 1967) (recognizing that if the state could avoid the application of the First Amendment merely by identifying any beneficial secular purpose, "any religious activity of whatever nature could be justified by public officials on the basis that it has beneficial secular purposes.").  Accordingly, the Supreme Court has stated that while it "often does accept governmental statements of purpose . . . . in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object, as against a predominantly religious one." <u>McCreary</u>, 545 U.S. at 865.

In the present case, Plaintiff argues that the Blasphemy Statute's purpose is religious and not secular.  First, Plaintiff contends that the statute's plain language alone makes it clear that its purpose is religious, pointing out that the definitions applied by the Bureau have religious meaning, as both "blasphemy" and "profane" are defined in religious terms as being irreverent to something sacred.  In addition, Plaintiff contends that because the statute does not merely prohibit "cursing" or "swearing," but instead, "<u>profane</u> cursing or swearing," religious context is

injected into the words "cursing" and "swearing."  Plaintiff also argues that the phrase "profaning

the Lord's name" has an entirely religious meaning.  For these reasons, Plaintiff argues that the

statute's plain language shows its manifest and predominant purpose to prohibit the use of words

that are irreverent, disrespectful, or hostile to religion, religious beliefs, or religious symbols.

Plaintiff also argues that while the legislative history regarding the Blasphemy Statute is sparse,

the statute's historical context confirms that its predominant purpose is religious.  For these

reasons, Plaintiff argues that the Blasphemy Statute fails <u>Lemon</u>'s purpose prong.

Defendant counters that the Blasphemy Statute's purpose is to protect the public from

offensive, indecent, and profane expression, something that has long been considered a legitimate

public interest separate and apart from any religious sphere.  Defendant contends that expression

that is blasphemous, obscene, profane, or insulting may be prohibited because its very utterance

is offensive and injurious to civil society, independent of any religious consideration.  Further,

Defendant argues that the Blasphemy Statute was enacted in an effort to preserve the peace and

maintain civil order by protecting Pennsylvania's citizens from offensive language, and that the

statute's primary purpose is to prohibit language that is grossly offensive.

When courts examine whether a governmental action or statute had a secular purpose,

"[t]he eyes that look to purpose belong to an objective observer, one who takes account of the

traditional external signs that show up in the text, legislative history, and implementation of the

statute, or comparable official act."  <u>Stratechuk</u>, 587 F.3d at 604 (quoting <u>McCreary</u>, 545 U.S. at

862 (internal quotations omitted)).  The Supreme Court has explained that "in determining the

legislative purpose of a statute, the Court has <u>also</u> considered the historical context of the statute,

and the specific sequence of events leading to the passage of the statute."  <u>Edwards</u>, 482 U.S at

594-95 (emphasis added) (internal citations omitted); <u>McCreary</u>, 545 U.S. at 862 (quoting same in parenthetical).  Thus, to determine whether the Blasphemy Statute has a secular purpose, the Court first looks to the Blasphemy Statute's text, before subsequently moving to its legislative history and historical context.

After reviewing the Blasphemy Statute's text, the Court finds that the statute's plain language makes apparent its predominantly religious purpose.  The statute prohibits words that constitute (1) blasphemy, (2) profane cursing or swearing, or (3) that profane the Lord's name. The very definitions used by the Bureau in interpreting and applying the Blasphemy Statute indicate that the statute's words, on their face, have a religious purpose.  First, blasphemy is defined as "irreverence toward God, religion, a religious icon or something considered sacred," indicating that such a definition has religious meaning.  Second, while the term "cursing or swearing" would have no religious meaning in the abstract, the fact that "profane" preceeds and thus modifies these words – and that the definition of "profanes," as applied by Defendant, is "irreverent to something sacred" – indicates an inherent religious meaning in this phrase as well. Third, the term "profanes the Lord's name" clearly has religious meaning.  Thus, the presence of the words "blasphemy," "profanes," and "Lord" in the statute's text is compelling evidence that there was no secular purpose sought to be achieved by the Blasphemy Statute's passage.

Defendant argues that the Blasphemy Statute was enacted "in an effort to preserve the peace and maintain civil order by protecting Pennsylvania's citizens from offensive language," and that the statute's primary purpose is to prohibit language that is grossly offensive.  (Def.'s Mot. for Summary Judgment at 23.)  While Defendant's proffered justification is noble enough, it fails to account for the fact the statute, on its face, does not actually say what Defendant would

have it say.  The Blasphemy Statute does <u>not</u> state that it prohibits language that is grossly

offensive, obscene, or insulting.  Instead, the Blasphemy Statute, on its face, seeks to prevent

corporate names containing words that are offensive or irreverent to religious beliefs.  The fact

that offensive, obscene, or insulting language is also swept into the Blasphemy Statute's

relatively broad purview does not alter this conclusion.  Defendant's stated purpose is belied and

contradicted by the statute's plain words.

Moving beyond the statute's text, courts typically analyze a statute's legislative history to

help understand its purpose.  <u>See, e.g.</u>, <u>Wallace</u>, 472 U.S. at 55-60 (analyzing a statute's

legislative history in determining purpose under the <u>Lemon</u> test).  In the present case, however,

an inquiry into legislative history bears little fruit.  As discussed above, the Blasphemy Statute's

nearly non-existent legislative history provides little guidance as to the Pennsylvania legislature's

actual purpose in enacting the statute.  Thus, the Court heeds the Supreme Court's instruction

that "in determining the legislative purpose of a statute, the Court has <u>also considered</u> the

<u>historical context</u> of the statute . . . and the <u>specific sequence of events</u> leading to passage of the

statute."  <u>Edwards</u>, 482 U.S. at 595 (1987) (emphasis added) (citing <u>Epperson</u>, 393 U.S. at

103-09; <u>Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252 (1977)).

Newspaper articles describing the Blasphemy Statute's historical context and the specific

sequence of events leading to its passage further illustrate the statute's predominant religious

purpose:  Local churches were upset about the name of the "God Damn Gun Shop" and

complained to their state representative, who subsequently introduced the Blasphemy Statute in

the state legislature.  <u>See</u> <u>Would Ban Obscenity in Firm Names</u>, The Gettysburg Times, Apr. 20,

1977, at 18 (stating that Rep. Mrkonic was "bombarded by letters from protesting churches" prior

to introducing the Blasphemy Statute in the Pennsylvania legislature).  Indeed, it was not a school organization or a group of concerned parents who complained about the "God Damn Gun Shop." Instead, it was local churches – religious entities – who complained, and as a result of their religiously-motivated outrage, the Blasphemy Statute was born.  Clearly, given the religious nature of blasphemy as a concept, both the historical context of the Blasphemy Statute's birth and the specific sequence of events leading to its inception further compel the conclusion that the statute had a primarily religious purpose.

All told, the Blasphemy Statute's plain language, historical context, and the specific sequence of events leading to its passage inevitably lead to the conclusion that, objectively speaking, the statute was introduced and passed into law with a predominantly religious purpose. In reaching this conclusion, the Court is well aware of the Third Circuit's statement that Lemon's purpose prong is a "relatively low threshold" for a state government to meet, Freethought Soc'y, 334 F.3d at 267, and that courts are "generally deferential to the government's proffered secular purpose as long as it is legitimate," Modrovich, 385 F.3d at 411.  Nevertheless, although courts have rarely looked behind the stated legislative purposes, it is clear that an avowed secular purpose, if found to be self-serving, may not be sufficient to avoid conflict with First Amendment.  See Stone v. Graham, 449 U.S. 39, 41 (1980); see also Edwards, 482 U.S. at 586-87 ("In determining the legislative purpose . . . the court is not required to accept a spurious stated legislative purpose."); McCreary, 545 U.S. at 864 ("[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective.").  Here, in the absence of an actual stated purpose by the legislature itself, and after considering Defendant's proffered post-hoc

justification for the Blasphemy Statute – provided some thirty-plus years after the Blasphemy

Statute's adoption – the Court finds that Defendant's contentions are merely secondary to a

predominant religious objective.  For the aforementioned reasons, the Blasphemy Statute fails the

Lemon test's purpose prong.[17]

### b.      Effect

The Lemon test's second prong considers whether the "principal or primary effect" of the

challenged governmental policy or practice "advances [ ] or inhibits religion."  Stratechuk, 587

F.3d at 605 (quoting Lemon, 504 U.S. at 613).  This means that "regardless of its purpose,

[government] action cannot symbolically endorse or disapprove of religion."  Busch, 567 F.3d at

100 (citing Lemon, 403 U.S. at 612).  The Third Circuit has emphasized Justice O'Connor's

explanation that "[t]he effect prong asks whether, irrespective of government's actual purpose,

the practice under review in fact conveys a message of endorsement or disapproval [of religion]."

Stratechuk, 587 F.3d at 606 (quoting Lynch, 465 U.S. at 690, (O'Connor, J., concurring)); see

also Black Horse Pike, 84 F.3d at 1495 (quoting same).  "While an adjudication of [a statute's]

effect must take into account the perspective of one who is neither Christian nor Jewish, as well

as of those who adhere to either of these religions, the constitutionality of its effect must also be

judged according to the standard of a 'reasonable observer.'"  Stratechuk, 587 F.3d at 606

(quoting Allegheny, 492 U.S. at 620).  In a passage "often quoted to describe the effects prong of

the Lemon test," Justice O'Connor emphasized that the "history and ubiquity" of a practice is

---

[17]The Supreme Court has explained that if a statute does not reflect a clearly secular purpose and thus fails Lemon's first prong, no consideration of the final two prongs of the Lemon test is necessary. Wallace, 472 U.S. at 43 n.22 (1985) ("Since these statutes do not reflect a clearly secular purpose, no consideration of the remaining two-parts of the Lemon test is necessary.").  Nevertheless, for the sake of completeness, the Court will examine the Blasphemy Statute under Lemon's second and third prongs.

relevant because it "provides part of the context in which a reasonable observer evaluates whether a challenged government practice conveys a message of endorsement of religion." Stratechuk, 587 F.3d at 606 (quoting Allegheny, 492 U.S. at 630) (O'Connor, J., concurring).

The Court finds that the Blasphemy Statute fails Lemon's second prong. By requiring the Bureau to reject corporate names that are "blasphemous," contain "profane" cursing or swearing, or that "profane the Lord's name" – given the religious meaning inherent in these terms' definitions as applied by the Bureau – the Blasphemy Statute requires the Bureau to reject applications that they believe are irreverent or offensive to religious beliefs, but accept applications that they believe are respectful or reverent to religious beliefs. Accordingly, the Court concludes that a reasonable observer would find that the Blasphemy Statute conveys a message of state endorsement of religion over non-religion. See Allegheny, 492 U.S. at 593 (noting that the Establishment Clause "preclude[s] government from conveying . . . a message that religion . . . is favored or preferred") (quoting Wallace, 472 U.S. at 70 (O'Connor, J., concurring)).

### c.   Entanglement

The third and final Lemon prong considers whether the challenged policy or practice "foster[s] an excessive government entanglement with religion." Stratechuk, 587 F.3d at 608 (quoting Lemon, 403 U.S. at 612-13 (internal citation omitted)). The Third Circuit has explained that "[a]s now-Justice Alito wrote when he was a member of this court, an excessive entanglement 'requires more than mere "[i]nteraction between church and state," for some level of interaction has always been "tolerated."'" Id. (quoting Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 534 (3d Cir. 2004) (quoting Agostini v. Felton,

521 U.S. 203, 233 (1997))).  The factors used to assess whether an entanglement is "excessive" are similar to the factors used to examine "effect," and thus, courts must "look to the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority."  Stratechuk, 587 F.3d at 608 (internal quotation marks omitted) (quoting Child Evangelism Fellowship, 386 F.3d at 534-35 (quoting Agostini, 521 U.S. at 232)).  The Supreme Court has noted that "[t]here is no exact science in gauging entanglement of church and state," and that the factors must be "considered cumulatively in judging the degree of entanglement."  Roemer v. Bd. of Pub. Works of Md., 426 U.S. 736, 766 (1976) (internal quotation omitted).

The question in the present case is therefore whether the application of the Blasphemy Statute by Bureau employees results in an excessive degree of entanglement with religion.  Under the undisputed facts, the Court must answer this question in the affirmative.  In reaching this conclusion, the Supreme Court's decision in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952), is an important precedent, albeit in a different factual context, which supports, if not mandates, this Court's conclusion that the Blasphemy Statute is unconstitutional.

In Burstyn, the Supreme Court struck down a New York statute which permitted the state to ban films that were deemed "sacriligious," finding that the statute was an unconstitutional abridgement of freedom of speech and of the press.  The Supreme Court explained that

> [i]n seeking to apply the broad and all-inclusive definition of ["]sacrilegious["] . . . the censor is set adrift upon a boundless sea amid a myraid of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies, [and] New York cannot vest such unlimited restraining control . . . in a censor.  Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be

subject to an inevitable tendency to ban the expression of unpopular sentiments . . . .

343 U.S. at 505-06 (internal citation omitted) (emphasis added).  While the Burstyn court only addressed the New York statute in the context of freedom of speech and of the press, the Supreme Court did note that "[a]pplication of the 'sacrilegious' test . . . might raise substantial questions under the First Amendment's guaranty of separate church and state . . . ." Id. at 506 (emphasis added).  No rational distinctions can be made between Burstyn and this case,[18] as here, Bureau employees applying the Blasphemy Statute are similarly tasked with applying the broad and all-inclusive definition of "blasphemy" in the absence of any guidance, standards, education, or training.

Judge Posner carried forward the Burstyn holding in a theatrical setting in Linnemeir v. Bd. of Trustees of Perdue Univ., 260 F.3d 757 (7th Cir. 2001), denying a motion for a stay pending appeal from the district court's refusal to grant a preliminary injunction.  The plaintiffs, residents of the state of Indiana, sought to prohibit Perdue University, a state institution, from putting on a performance of a "notorious" play titled "Corpus Christi," which depicts Jesus Christ as a homosexual who has sexual relations with his disciples.  Id. at 758.  The plaintiffs sought the injunction on the theory that by allowing the presentation of this play, the university would violate the First Amendment by publicly endorsing anti-Christian beliefs.  Id.  In a holding supportive of this Court's decision to strike down Pennsylvania's Blasphemy Statute, Judge Posner, noting that the play was "indeed blasphemous," refused to grant the stay pending appeal,

---

[18]Justice Frankfurter's scholarly concurrence includes many historical references to matters considered "sacriligious" in history, and the overlapping nature of ideas considered sacriligious and blasphemous.  See 343 U.S. at 519 et seq., notes 27 et seq. and the Appendix.

holding that "[t]he contention that the First Amendment forbids a state university to provide a venue for the expression of views antagonistic to conventional Christian beliefs is absurd." Id. at 758-59.  Thus, in the educational context, the Seventh Circuit found that imposing censorship on a theatrical production because it had an anti-Christian bias was not allowed under the Constitution, stressing the "controlling principle" that the First Amendment "forbids . . . the prohibition of theory which is deemed antagonistic to a particular dogma . . . . '[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them." Id. at 759 (quoting Epperson, 393 U.S. at 106-07) (quoting Burstyn, 343 U.S. at 505).

In the present case, the above-stated testimony of Bureau employees underscores the nearly limitless entanglement with religion inherent in applying the Blasphemy Statute.  Indeed, the deposition testimony of Mr. Decker, Ms. Brown, and Ms. Drake, taken together, makes very apparent that Bureau employees interpreted and applied the Blasphemy Statute and Rejection Code 170 completely differently, and with complete discretion to apply the statute as each saw fit, based only on their own individual religious beliefs, experiences, and upbringing:  Mr. Decker believed that "I Choose Hell" was blasphemous, but today is unsure of whether "I Choose Satan" would be blasphemous; Ms. Brown thinks that "I Choose Hell" is blasphemous because the speaker is "choosing hell," whereas "I Reject Hell" would not be blasphemous because, contextually, the speaker is "rejecting" hell instead of "choosing" it; Ms. Drake considers the word "hell" to be blasphemous only because it appeared on Ms. Brown's list of suspect words; but Ms. Brown testified that she did not intend that an application containing one of the words on her list should automatically be rejected as violating the Blasphemy Statute. Such tortured logic serves to demonstrate the statute's inherent entanglement with religious

concepts, where here, as in <u>Burstyn</u>, Bureau employees are impermissibly "set adrift upon a boundless sea amid a myraid of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies."  343 U.S. at 505-06.  As it turns out, Christianity was the orthodoxy that carried the day within the Bureau,[19] but it could be <u>any</u> religion or set of religious beliefs that determines how an individual Bureau employee applies the Blasphemy Statute.  That the Blasphemy Statute requires Bureau employees to make such haphazard, standardless decisions, based solely upon their respective religious beliefs and experiences, further underscores the statute's impermissibly excessive degree of entanglement with religion.

    Additionally, the Court rejects Defendant's argument that the Blasphemy Statute does not entangle Bureau employees with religion where the Bureau's list of suspect words was revised to no longer include words with religious meaning.  This list, whether in its present form or in some future iteration, is merely a non-binding, subjectively-written internal memo, subject to change at any time.  That the Bureau has removed from the current list words with religious meaning fails to remedy the impermissible entanglement with religion that the statute requires; Bureau employees, in their own discretion, are still required to make standardless determinations as to what constitutes blasphemy, profane cursing or swearing, or profanes the Lord's name, based on nothing but their own religious beliefs.  Even if the list of suspect words contains no religious phrases, there is nothing stopping a Bureau employee from applying the statute and rejecting a

---

[19]For instance, both the Original and Revised Lists of suspect words included the terms "Christ," "Jesus," and "God," but did <u>not</u> include the words "Allah," "Muhammad," "Vishnu," "Krishna," "Shiva," "Buddha," "Bhagwan," "Elohim," "Adonai," "the Goddess," "the Great Spirit," or any other words or phrases relating to any other religions or religious deities.

proposed corporate name if the employee believes that the name contains a phrase that constitutes blasphemy, regardless of whether the phrase in question appears or does not appear on the list.  Thus, the Bureau's assurance that it will apply the Blasphemy Statute more restrictively than its language provides simply emphasizes the statute's constitutional defects. For these reasons, the Blasphemy Statute entangles Bureau employees with religion to a degree such that it fails <u>Lemon</u>'s third prong.

### B.   Freedom of Speech

In addition to his Establishment Clause arguments, Plaintiff contends that the Blasphemy Statute violates the First Amendment's Free Speech Clause because it constitutes an impermissible viewpoint-based restriction on valid expressive speech by prohibiting corporate names that convey a perceived anti-religious viewpoint, because it is an unlawful prior restraint on speech that vests unbridled discretion in state officials who, in their sole discretion, may prohibit names based on their own religious or anti-religious views, and because it is void for vagueness.

Defendant, on the other hand, argues that the Blasphemy Statute does not violate the Free Speech Clause.  First, Defendant contends that a corporate name is not expressive speech, but instead, is merely commercial speech afforded only limited First Amendment protection. Second, as an alternative, Defendant argues that even outside the commercial speech context, the Blasphemy Statute is constitutional because it governs speech in a non-public forum, and is both reasonable and viewpoint-neutral.  Defendant further argues that the Blasphemy Statute does not violate the Free Speech Clause because it addresses obscenity and profanity, both being unprotected classes of speech.  Finally, Defendant argues that the Blasphemy Statute is not

overbroad, does not constitute an unconstitutional prior restraint, and is not void for vagueness.

In determining whether the Blasphemy Statute violates the Free Speech Clause, the Court must first determine whether a corporate name is "commercial speech" for First Amendment purposes.  As explained below, the Court's review of case law on this issue leads to the conclusion that a corporate name can potentially be considered commercial speech. Nevertheless, in the absence of any clear guidance from the Supreme Court or Third Circuit, the Court will not make a definitive ruling on this issue.  Instead, the Court will analyze the constitutionality of the Blasphemy Statute under <u>both</u> the commercial speech and non-commercial, private speech doctrines.

### 1.      Commercial Speech

"The Supreme Court has repeatedly emphasized that '[c]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'"  <u>Riel v. City of Bradford</u>, 485 F.3d 736, 752 (3d Cir. 2007) (quoting <u>Fla. Bar v. Went For It, Inc.</u>, 515 U.S. 618, 623 (1995) (internal quotation marks omitted)).  Stated otherwise, while commercial speech is entitled to First Amendment protection, it gets "protection somewhat less extensive than that afforded 'noncommercial speech.'"  <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia</u>, 898 F.2d 914, 932 (3d Cir. 1990) (quoting <u>Zauderer v. Office of Disciplinary Counsel</u>, 471 U.S. 626, 637 (1985)).  While "the prevailing framework under which restrictions on commercial speech are considered was laid down in <u>Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.</u>, 447 U.S. 557 (1980)," <u>Riel</u>, 485 F.3d at 752, before analyzing the Blasphemy Statute under the <u>Central Hudson</u> test, the

Court must first determine whether a corporate name qualifies as "commercial speech."

As the Third Circuit has recognized, "the Supreme Court has provided substantial guidance" as to what qualifies as "commercial speech." U.S. Healthcare, 898 F.2d at 933. "Commercial speech may be broadly defined as expression related to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services." Id. (citing Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66-67 (1983); Central Hudson, 447 U.S. at 561). "The Supreme Court has cited three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." Id. (citing Bolger, 463 U.S. at 66-67). "An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial." Id. (citing Bolger, 463 U.S. at 67). Even still, the Supreme Court has noted the inherent difficulty in determining whether speech qualifies as commercial speech, stating that "the precise bounds of the category of expression that may be termed commercial speech" are "subject to doubt," and that "[o]ur commercial speech doctrine rests heavily on the 'common-sense' distinction between speech proposing a commercial transaction . . . and other varieties of speech." Zauderer, 471 U.S. at 637 (internal quotation marks omitted) (quoting Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 455-56 (1978)).

At the onset, the Court notes that a corporate name does not at first blush seem to "propose a commercial transaction." Furthermore, a common-sense consideration of the three factors used to determine whether speech is commercial speech seems to suggest that a corporate name is not commercial speech, as: (1) a corporate name is not an advertisement, using the

generally accepted definition of the term;[20] (2) a corporate name does not necessarily refer to a specific product or service, although it is, for all intensive purposes, an overarching label of sorts for an entity that can – and in the case of a for-profit company, likely does – create or provide products or services; and (3) while the creator of a corporate name likely has some economic motivation to apply for a desired name, in some cases – such as the present case – the speaker can rightfully argue that he or she has personal, non-economic motivations for their desired corporate name.

Nevertheless, answering the question of whether a corporate name is commercial speech for purposes of the present case requires a more nuanced analysis.  While the parties argued their respective positions in their summary judgment briefing, neither Plaintiff nor Defendant set forth nor addressed any specific case law dealing with whether a corporate name is commercial speech for First Amendment purposes.  Even still, the Court's own inquiry into this question indicates that a corporate name may, in fact, be commercial speech, as the Court has identified five cases which stand for the proposition that corporate names can be commercial speech.

First, in Friedman v. Rogers, 440 U.S. 1 (1979), the Supreme Court, when facing the constitutionality of a Texas law prohibiting the practice of optometry under a trade name, assumed name, or corporate name, stated:

> Once a trade name has been in use for some time, it may serve to identify an optometrical practice and also to convey information about the type, price, and quality of services offered for sale in that practice.  In each role, the

---

[20]Merriam-Webster's Online Dictionary defines the verb "advertise" as:  "(1) to make something known to; (2)(a) to make publicly and generally known, (b) to announce publicly especially by a printed notice or a broadcast, (c) to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize."  Id., available at http://www.merriam-webster.com/dictionary/advertise (last visited May 19, 2010).

> trade name is used as part of a proposal of a commercial transaction. . . .
> [T]he optometrist who uses a trade name does not wish to editorialize on any
> subject, cultural, philosophical, or political.  He does not wish to report any
> particularly newsworthy fact, or to make generalized observations even
> about commercial matters.  His purpose is strictly business.  The use of trade
> names in connection with optometrical practice, then, is a form of
> commercial speech and nothing more.

Id. at 11 (emphasis added) (internal citations and quotations marks omitted).  Second, in Piazza's

Seafood World, LLC v. Odom, 2004 WL 2998575 (E.D. La. Dec. 23, 2004), where a Louisiana

seafood import and distribution business challenged the constitutionality of a Louisiana statute

regulating the use of the name "Cajun" in business names, Judge Zainey stated:

> Plaintiff . . . began marketing certain products under the brand names "Cajun
> Boy" and "Cajun Delight" (collectively referred to as "Cajun Boy") some
> time in 1976.  Plaintiff asserts that it has a substantial investment of money
> and time in promoting its Cajun Boy products and claims sales of over fifty
> million dollars in the last five years alone.  In 2000, [Plaintiff] registered the
> Cajun Delight name with the Louisiana Secretary of State.   In April 2003
> [Plaintiff] registered the Cajun Boy trade name with the Secretary of State.
> . . . The parties agree that a trade name constitutes commercial speech, and
> that regulations on commercial speech are subject to the four-part test
> articulated by the Supreme Court in [Central Hudson] . . . .

Id. at *2-3 (citing Central Hudson, 447 U.S. 557) (emphasis added).

Third, in U.S. Olympic Comm. v. Olympic Supply, Inc., 655 F. Supp. 2d 599 (D. Md.

2009), where the U.S. Olympic Committee filed a trademark infringement action against a

defendant seller of medical, janitorial, and industrial supplies which used the name "Olympic" in

its corporate name, the defendant argued that its corporate name was not commercial speech

because it did not propose a commercial transaction, was not an advertisement (because it made

no reference to a specific product), and was not motivated by economic interest, but instead,

merely identified a corporate entity.  See id. at 605-06.  Judge Chasanow did not agree, finding

-44-

that "[u]ndoubtedly, some of [the defendant]'s uses of the word Olympic involve commercial speech. . . . [The defendant] uses the word 'Olympic' as part of its retail and wholesale business, on its 'Olympic News' signage, on invoices, letterhead, on bags, and on advertising materials associated with its retail and wholesale business." Id. at 606 (emphasis added) (internal citations and quotation marks omitted).

Fourth, in San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522 (1987), the U.S. Olympic Committee and the International Olympic Committee sued a California corporation and various individuals in an effort to restrain their use of the term "Olympic" when promoting the "Gay Olympic Games." The defendants argued that the use of the word "Olympic" was intended to convey a political statement about the status of homosexuals in society. Id. at 535. The Supreme Court found that the use of the term "Olympic" was undoubtedly commercial speech, as the defendants used the term "Olympic" to advertise the Gay Olympic Games, to induce the sale of goods carrying the Gay Olympic Games' logo, and to exploit the "commercial magnetism" of the word. Id. at 539.

Fifth, in Michel v. Bare, 230 F. Supp. 2d 1147 (D. Nev. 2002), an attorney brought an action to enjoin the enforcement of a Nevada Supreme Court rule limiting the use of trade names by law firms. The attorney, who had formed the Professional Law Corporation of Herbert Michel, Jr., doing business under the registered service marks "Your Legal Power" and "Su Poder Legal," spent over five years and $1.2 million promoting these two trade names. Id. at 1148. Nevada's rule, however, prohibited the use of trade names by for-profit legal services organizations. Id. The attorney argued that the prohibition of his use of the two trade names violated, inter alia, his First Amendment right to freedom of speech. Judge Pro ultimately found

the trade names to be commercial speech, and used the <u>Central Hudson</u> test to determine that the

Nevada rule unconstitutionally infringed upon the attorney's commercial free speech rights.

These five cases, taken together, demonstrate that a corporate name can potentially be

commercial speech. Thus, without ruling on the issue, the Court will analyze the Blasphemy

Statute under the <u>Central Hudson</u> test to determine its constitutionality on the assumption that a

corporate name is, indeed, commercial speech.

<b>a.      Central Hudson Test</b>

The Supreme Court's "general approach to restrictions on commercial speech is . . . well

settled. The States and the Federal Government are free to prevent the dissemination of

commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction."

<u>Zauderer</u>, 471 U.S. at 638 (internal citations omitted). The Supreme Court has emphasized,

however, that "[c]ommercial speech that is <u>not</u> false or deceptive and does <u>not</u> concern unlawful

activities, however, may be restricted <u>only</u> in the service of a <u>substantial governmental interest</u>,

and only through means that <u>directly advance that interest</u>." <u>Id.</u> (emphasis added) (citing <u>Central</u>

<u>Hudson</u>, 447 U.S. at 566).

<u>Central Hudson</u> is the prevailing test for determining the constitutionality of restrictions

on commercial speech. <u>Riel</u>, 485 F.3d at 752. The four-part <u>Central Hudson</u> test requires courts

to: (1) determine whether the expression is protected by the First Amendment, meaning that the

speech in question "at least must concern lawful activity and not be misleading," (2) ask whether

the asserted governmental interest is substantial – and, if the first and second inquiries yield

positive answers, determine (3) "whether the regulation directly advances the governmental

interest asserted," and (4) "whether [the regulation] is not more extensive than is necessary to

-46-

serve that interest." <u>Pitt News v. Pappert</u>, 379 F.3d 96, 107 (3d Cir. 2004) (quoting <u>Central</u>

<u>Hudson</u>, 447 U.S. at 566).

### i.　　**Prong One**

For commercial speech to gain First Amendment protection, the speech "must concern

lawful activity and not be misleading." <u>Central Hudson</u>, 447 U.S. at 556.  Clearly, a corporate

name concerns lawful activity and is not misleading, such that the first prong is met.

### ii.　　**Prong Two**

<u>Central Hudson</u>'s second prong requires that the Court determine whether the asserted

governmental interest served by the Blasphemy Statute is substantial.  <u>Id.</u>  Defendant argues that

the governmental interest in preserving the peace, protecting the sensitivities of the listeners, and

eliminating profane, obscene, and insulting words from corporate names is substantial.  Plaintiff

counters that the government's interest is not substantial because offensiveness is not a sufficient

justification for a prohibition of commercial speech, and because the state has no legitimate

interest in protecting any or all religious views distasteful to it.  Without ruling on the second

prong, the Court will assume for purposes of the <u>Central Hudson</u> test that the governmental

interested served by the Blasphemy Statute is substantial.

### iii.　　**Prong Three**

Even assuming that the Blasphemy Statute meets <u>Central Hudson</u>'s first two prongs,

Defendant has failed to demonstrate that the Blasphemy Statute "directly advances" any of the

proffered governmental interests, as required by <u>Central Hudson</u>'s third prong.  The Supreme

Court has explained that <u>Central Hudson</u>'s third prong "concerns the relationship between the

harm that underlies the State's interest and the means identified by the State to advance that

interest." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001).  Further stated, the third

prong requires that the speech restriction "directly and materially advanc[e] the asserted

governmental interest."  Id. (quoting Greater New Orleans Broad. Ass'n, Inc. v. United States,

527 U.S. 173, 188 (1999)); see also Pitt News, 379 F.3d at 107 (to satisfy third prong,

government must demonstrate that the challenged law "alleviate[s]" the cited harms "to a

material degree" (quoting Florida Bar, 515 U.S. at 624 (citation omitted))).  "It is well

established that '[t]he party seeking to uphold a restriction on commercial speech carries the

burden of justifying it.'" Edenfield v. Fane, 507 U.S. 761, 770 (1993) (quoting Bolger, 463 U.S.

at 71, n. 20).  "This burden is not satisfied by mere speculation or conjecture; rather, a

governmental body seeking to sustain a restriction on commercial speech must demonstrate that

the harms it recites are real[,] and that its restriction will in fact alleviate them to a material

degree." Lorillard Tobacco, 533 U.S. at 555 (quoting Greater New Orleans, 527 U.S. at 188).

In this case, Defendants have not met their burden of showing that the "harms it recites

are real," Lorillard Tobacco, 553 U.S. at 555, that the Blasphemy Statute directly advances the

proffered governmental interests "to a material degree," Florida Bar, 515 U.S. at 624, or that the

statute provides anything more than "ineffective or remote support for the government's

purposes," Edenfield, 507 U.S. at 770 (quoting Central Hudson, 447 U.S. at 564).  While

Defendant argues that a corporate name containing blasphemy, profane cursing or swearing, or

that profanes the Lord's name creates dangers of inflaming tempers, disrupting the peace, or

inciting resentment (Def.'s Mot. for Summary Judgment at 9), Defendant presents no evidence to

support these conclusions, and "the record does not disclose any anecdotal evidence . . . that

validates [Defendant]'s suppositions." Edenfield, 507 U.S. at 771.  The only suggestion that a

ban on corporate names containing blasphemy, profane cursing or swearing, or that profane the

Lord's name would "preserve the peace" (Def.'s Mot. for Summary Judgment at 9) are

Defendant's own conclusory statements set forth in his briefing, which "add little if anything" to

Defendant's "original statement of [his] justifications." Edenfield, 507 U.S. at 771.

"[I]t is not enough if a law provides only ineffective or remote support for the

government's purposes, or if there is little chance that the law will advance the state's goal." Pitt

News, 379 F.3d at 107 (internal quotation marks omitted) (quoting Edenfield, 507 U.S. at 770;

Lorillard Tobacco, 533 U.S. at 566).  Accordingly, Defendant has failed to demonstrate "that the

harms [he] recites are real," Lorillard Tobacco, 533 U.S. at 556 (internal quotations omitted), as

Defendant's contentions "rel[y] on nothing more than 'speculation' and 'conjecture.'" Pitt

News, 379 F.3d at 107.  The Court thus finds that Defendant has failed to meet his burden under

Central Hudson's third prong.

<strong>vi.   Prong Four</strong>

The Blasphemy Statute also fails Central Hudson's fourth prong because it is not

appropriately tailored to achieve Defendant's asserted objectives.  Central Hudson's fourth prong

asks whether the speech restriction is "not more extensive than necessary to serve" the interests

that support it. Central Hudson, 447 U.S. at 566.  This prong "does not require government to

use the least restrictive means to achieve its goals, but it does demand a 'reasonable fit between

the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly

tailored to achieve the desired objective.'" Pitt News, 379 F.3d at 108 (quoting Lorillard

Tobacco, 533 U.S. at 555).  "On the whole, then, the challenged regulation should indicate that

its proponent carefully calculated the costs and benefits associated with the burden on speech

imposed by its prohibition." <u>Greater New Orleans</u>, 527 U.S. at 188 (internal quotation marks and quotations omitted).

After review, the Court finds that the Blasphemy Statute is far more extensive than necessary to serve Defendant's proffered interests.  Defendant argues that the statute's purpose is to restrict corporate names that are profane, obscene, and insulting, but, as Plaintiff correctly argues, the Blasphemy Statute's restrictions sweep far beyond words that are merely obscene or insulting, and instead, reach words that are irreverent to something held sacred <u>regardless</u> of whether the words are profane, obscene, vulgar, or even remotely offensive.  Simply stated, there is not a reasonable fit between Defendant's proffered purpose and the Blasphemy Statute's restrictions such that the statute is narrowly tailored to achieve Defendant's stated objectives. The Court therefore finds that Defendant cannot meet its burden under <u>Central Hudson</u>'s fourth prong.

For the aforementioned reasons, assuming that a corporate name is, in fact, commercial speech, the Court finds that the Blasphemy Statute fails the <u>Central Hudson</u> test, and as such, impermissibly infringes on First Amendment commercial speech rights.  As the Supreme Court has explained, "it is clear that commercial speech cannot be banned because of an unsubstantiated belief that its impact is 'detrimental,'" <u>Linmark Associates, Inc. v. Twp. of Willingboro</u>, 431 U.S. 85, 92 n.6 (1977), and "the <u>mere possibility</u> that <u>some members of the population</u> might find [commercial speech] embarrassing or offensive <u>cannot justify suppressing it</u>," <u>Zauderer</u>, 471 U.S at 648 (emphasis added).  Such reasoning is directly applicable in the present case, where Plaintiff's desired corporate name was rejected under the Blasphemy Statute because it included the word "hell," and where Defendant argues that the Blasphemy Statute's

purposes include "preserving the peace" and "protecting the sensitivities of the listeners."

(Def.'s Mot. for Summary Judgment at 9.)  The mere possibility that some Pennsylvania citizens

might find a corporate name containing the word "hell" to be offensive cannot justify its

suppression.  For these reasons, the Blasphemy Statute fails the <u>Central Hudson</u> test, and

impermissibly infringes on First Amendment commercial speech rights

### 2. <u>Non-Commercial Speech</u>

#### a. <u>Expressive Speech</u>

Assuming that a corporate name is not commercial speech, because a corporate name

does not entail a person actually speaking or writing, a corporate name garners protection under

the Free Speech Clause only if it constitutes expressive speech.  Thus, as a threshold question,

the Court must address the parties' arguments regarding whether the Blasphemy Statute's

restriction of corporate names reaches expressive speech entitled to First Amendment protection.

<u>See, e.g.</u>, <u>Tenafly</u>, 309 F.3d at 158 n.15 ("Whether the Free Speech Clause applies is a threshold

question necessary to a proper analysis of the parties' arguments . . . . [as to whether] protected

expression is involved here.").

The First Amendment's Free Speech Clause provides that "Congress shall make no law . .

. abridging the freedom of speech."  U.S. Const. amend. I.  This provision applies to the states

through the Due Process Clause of the Fourteenth Amendment.  <u>Borden</u>, 523 F.3d at 168 (citing

<u>Gitlow v. New York</u>, 268 U.S. 652, 666, (1925)).  The Third Circuit has explained that the term

"speech" is "not construed literally, or even limited to the use of words.  Constitutional

protection is afforded not only to speaking and writing, but also to some nonverbal acts of

communication [such as] 'expressive conduct' (or 'symbolic speech')."  <u>Tenafly</u>, 309 F.3d at

158.

The parties dispute whether a corporate name is expressive speech worthy of First Amendment protection.  Plaintiff argues that obtaining and using a corporate name is a form of expression because a corporate name often makes a statement about the corporation, the incorporator, or the incorporator's religious or philosophical views.  Specifically, Plaintiff argues that the Blasphemy Statute:  abridges freedom of speech by denying individuals the ability to express, through their corporate names, personal views that may be irreverent or disrespectful to religion or a set of religious beliefs; denies individuals the commercial and symbolic value that comes with the exclusive right to use a corporate name in Pennsylvania; and discourages speech because it contains an enforcement provision that permits the Attorney General or any person adversely affected the right to seek an injunction against any violation of the statute.

Defendant, on the other hand, argues that the Blasphemy Statute does not violate the Free Speech Clause because it addresses classes of speech that are not protected by the First Amendment, those being obscenity and profanity.  Defendant argues that Plaintiff's chosen name clearly falls into these categories because the term "hell" in and of itself can be perceived as profane, and thus, as an expression falling into an unprotected category of speech, is not entitled to First Amendment protection.

The Court finds that a corporate name <u>is</u> a form of expressive speech protected under the First Amendment.  As Plaintiff correctly argues, a corporate name can and often does make a statement about the corporation, the incorporator, or the incorporator's religious or philosophical views.  Defendant's argument that the Blasphemy Statute addresses unprotected classes of speech such as obscenity and profanity is without merit, as "obscenity" refers primarily to

sexually-themed speech,[21] and "profanity," without more, is not a valid reason for suppressing

speech.[22]  For these reasons, the Court finds that a corporate name is private[23] expressive speech

_____

[21]The Supreme Court has explained that "State statutes designed to regulate obscene materials must be carefully limited," Miller v. California, 413 U.S. 15, 23-24 (1973) (quotation omitted), and that the Court "confine[s] the permissible scope of such regulation to works which depict or describe sexual conduct. . . . A state offense must also be limited to works which . . . appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which . . . do not have serious literary, artistic, political, or scientific value." Id. at 24 (emphasis added) (footnote omitted).  As in the present case, a statute which restricts corporate names containing blasphemy, profane cursing or swearing, or that profane the Lord's name clearly does not regulate works which depict or describe sexual conduct. Defendant's argument to the contrary is off-base.

[22]The Third Circuit has explained that "[o]n the specific subject of 'profane' words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent arousal, are not 'fighting words,' and are therefore protected speech." Johnson v. Campbell, 332 F.3d 199, 212 (3d Cir. 2003) (citing Cohen v. California, 403 U.S. 15, 20 (1971)).  Here, the Blasphemy Statute is not limited by its language or history to "fighting words," and thus, Defendant's argument that the Blasphemy Statute restricts unlawful "profane" speech fails.

[23]The speech in question here – a corporate name – constitutes private speech as opposed to governmental speech.  It is true that "generally, the government may limit speech that takes place on its own property without running afoul of the First Amendment." Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 225 (3d Cir. 2003) (citing Lamb's Chapel, 508 U.S. at 390); see also Johanns v. Livestock Marketing Ass'n, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 139, n.7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression").  A government entity has the right to "speak for itself," Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229 (2000), and "is entitled to say what it wishes," Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995), and "select the views that it wants to express," Pleasant Grove City v. Summum, -- U.S. --, 129 S.Ct. 1125, 1131 (2009) (citing Rust v. Sullivan, 500 U.S. 173, 194 (1991)).

Nevertheless, the Court finds that a reasonable person would not consider the government to be the speaker of a corporate name, as opposed to a private party.  Accordingly, such speech is properly classified as private speech, and not governmental speech. See Pleasant Grove City, -- U.S. --, 129 S.Ct. at 1131 (Souter, J., concurring) ("[T]he best approach that occurs to me [to determine whether speech is governmental or private speech] is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige").  Indeed, a corporate name serves as the primary identifier for a corporate entity, and while the state must review and approve a desired corporate name, the fact remains that a corporate name represents the company itself, the company's products or services, the company's ethos or message, and/or the company's founder, leadership, or employees.  As an example, when considering the technology company Apple, Inc., a California corporation, a reasonable person might think about Apple's ubiquitous products (iPads, iPhones, or iPods), its iconic founder and leader (Steve Jobs), its uniquely identifiable product designs, or the company's overall brand image.  A reasonable person would not, however, in any way think that Apple's corporate name constitutes speech on the part of the government

-53-

protected by the First Amendment, and will analyze the Blasphemy Statute's constitutionality accordingly.

### b.    Viewpoint-Based Regulation

Because the Court concludes that a corporate name communicates private expressive speech, the Court now turns to the issue of whether the Blasphemy Statute impermissibly restricts protected speech.  As the Supreme Court has "held time and again:  'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'"  Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 135 (1992) (citing Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984); Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116 (1991); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230 (1987)).  For the reasons discussed below, the Court finds that the Blasphemy Statute unconstitutionally permits the State to restrict speech on the basis of viewpoint.

As the Third Circuit has explained, "[t]he Supreme Court has frequently declared that the very core of the First Amendment is that the government cannot regulate speech 'because of its message, its ideas, its subject matter, or its content.'"  Startzell v. City of Philadelphia, Pa., 533 F.3d 183, 192 (3d Cir. 2008) (quoting Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 96 (1972)); see also Rosenberger, 515 U.S. at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").  "If the marketplace of ideas is to remain free and open, governments must not be allowed to choose which issues are

---

of the state of California, nor link or confuse Apple's corporate name to or with the government of the state of California.  For these reasons, the Court finds that a corporate name is private and not governmental speech.

worth discussing or debating." Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n, 447 U.S.

530, 537-38 (1980) (internal quotation marks and quotation omitted); see also Startzell, 553 F.3d

at 192-93 (quoting same). "[L]aws that by their terms distinguish favored speech from

disfavored speech on the basis of the ideas or views expressed are content based," Startzell, 553

F.3d at 193 (quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 643 (1994)), and as such

"are 'presumptively invalid,'" id. (quoting R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382

(1992)). Content- or viewpoint-based regulations are subject to the "most exacting scrutiny," id.

(quoting Turner, 512 U.S. at 642), because they "pose the inherent risk that the Government

seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information

or manipulate the public debate through coercion rather than persuasion," id. (quoting Turner,

512 U.S. at 641).

Furthermore, "[w]hen the government targets not subject matter, but particular views

taken by speakers on a subject, the violation of the First Amendment is all the more blatant."

Rosenberger, 515 U.S. at 829 (emphasis added) (citing R.A.V., 505 U.S. at 391 ). "[V]iewpoint

discrimination is censorship in its purest form and government regulation that discriminates

among viewpoints threatens the continued vitality of 'free speech.'" Startzell, 553 F.3d at 193

(quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 62 (1983) (Brennan, J.,

dissenting)). "Viewpoint discrimination is thus an egregious form of content discrimination.

The government must abstain from regulating speech when the specific motivating ideology or

the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger, 515

U.S. at 829 (citing Perry, 460 U.S. at 46).

"[T]he first step in First Amendment analysis has been to determine whether a statute is

content-neutral or content-based."  Rappa v. New Castle County, 18 F.3d 1043, 1053 (3d Cir.

1994).  The Supreme Court has made clear that the "principal inquiry" in assessing a claim of

content-based (and thus viewpoint-based) discrimination "is whether the government has adopted

a regulation of speech because of [agreement or] disagreement with the message it conveys."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); see also Startzell, 533 F.3d at 197

(quoting Ward, explaining same).  "It is the government's purpose that controls.  A regulation is

deemed content neutral if it serves purposes unrelated to the content of speech, regardless of

whether it incidentally affects certain speakers or messages and not others.  That is, government

regulation of speech is properly regarded as content neutral if it is 'justified without reference to

the content of the regulated speech.'"  Startzell, 533 F.3d at 197 (internal citations omitted)

(quoting Ward, 491 U.S. at 791 (emphasis omitted)).  "Viewpoint-based restrictions can only be

upheld in the rare instance that they survive 'strict scrutiny,'" Children First Found., Inc. v.

Legreide, 2010 WL 1408323, at *2 (3d Cir. Apr. 9, 2010) (non-precedential) (citing Rosenberger,

515 U.S. at 828-30), meaning the government must show that the "regulation is necessary to

serve a compelling state interest[,] and that it is narrowly drawn to achieve that end,"[24] Rappa, 18

F.3d at 1053 (quoting Boos v. Barry, 485 U.S. 312, 321 (1988)); see also Riel, 485 F.3d at 743

(quoting same).

---

[24]If, on the other hand, [a court] determine[s] that the statute is content-neutral in that it 'merely
restricts the total quantity of speech by regulating the time, the place or the manner in which one can
speak, a very different test applies."  Riel, 485 F.3d at 743 (internal quotation marks and citation
omitted).  In such cases, "the government may impose reasonable restrictions on the time, place, or
manner of protected speech, provided [1] the restrictions 'are justified without reference to the content of
the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and
[3] that they leave open ample alternative channels for communication of the information.'" Id. (quoting
Ward, 491 U.S. at 791).  Here, because the Court finds that the Blasphemy Statute is viewpoint-based
and not content-neutral, this test does not apply.

Defendant contends that the Blasphemy Statute is both reasonable and viewpoint neutral, arguing that the statute seeks to preserve the peace and maintain civil order by protecting Pennsylvania's citizens from language constituting a nuisance under contemporary community standards without any relation to religion or theology – words that are unprotected under the First Amendment.  (Def.'s Mot. for Summary Judgment at 18.)  Defendant contends that the Blasphemy Statute merely seeks to exclude profane and offensive words from appearing in corporate names, and thus, the statute does not discriminate against speech because of its message, but instead, because it contains an offensive term.  (Def.'s Mot. for Summary Judgment at 18.)  To this end, Defendant argues that that the Blasphemy Statute's restrictions are based on the reasonable rationale that a message included in a corporate name has some appearance of government endorsement, and that Pennsylvania does not wish to be perceived as endorsing the use of profane and offensive language.  (Def.'s Mot. for Summary Judgment at 18.)  Defendant further argues that the Blasphemy Statute is content and viewpoint neutral because it prohibits <u>all</u> names containing profane or obscene language, regardless of whether that language is associated with theology or religion.  (Def.'s Mot. for Summary Judgment at 18.)

Plaintiff, on the other hand, argues that the Blasphemy Statute discriminates based on viewpoint because it permits corporate names that are respectful or reverent to religion and religious beliefs, but prohibits corporate names that are disrespectful or irreverent to religion and religious beliefs.  Plaintiff further argues that the Blasphemy Statute not only permits government officials to discriminate based on a speaker's viewpoint, but actually <u>directs</u> government officials to discriminate based on viewpoint.  In addition to restricting speech based on viewpoint, Plaintiff argues that the Blasphemy Statute serves no legitimate, let alone substantial,

government interest.

After considering the parties' arguments and their responses to the Court's various questions and hypotheticals posed at oral argument, the Court finds that the Blasphemy Statute incontrovertibly – and thus unconstitutionally – regulates speech on the basis of viewpoint.  As previously discussed, the very definitions used by the Bureau in interpreting and applying the Blasphemy Statute indicate that the statute's terms, on their face, have religious meaning.  As such, the statute restricts only those proposed corporate names that are disrespectful or irreverent towards religion – but not vice versa.  Stated otherwise, if a proposed corporate name is respectful or reverent towards religion, it survives under the Blasphemy Statute, but a proposed corporate name that is disrespectful or irreverent to religion and religious beliefs would be denied.  That the Blasphemy Statute restricts speech on the basis of one particular viewpoint could not be more apparent.

The Supreme Court, having cautioned that speech restrictions on the basis of viewpoint are an "egregious form of content discrimination," has instructed that "[t]he government <u>must abstain</u> from regulating speech when the <u>specific motivating ideology</u> or the <u>opinion or perspective of the speaker</u> is the <u>rationale for the restriction</u>."  <u>Rosenberger</u>, 515 U.S. at 829 (emphasis added).  Here, the Blasphemy Statute restricts speech solely based on the speaker's motivating ideology, opinion, or perspective.  Thus, Pennsylvania has unconstitutionally authorized the expression of only one specific viewpoint (reverence to religion), while silencing the expression of the contrary viewpoint (irreverence to religion).

Defendant's argument that the Blasphemy Statute is content and viewpoint neutral because it prohibits <u>all</u> names containing profane or obscene language, regardless of whether that

-58-

language is associated with theology or religion, fails to understand the true nature of the statute.

Indeed, Defendant argues that the Blasphemy Statute is constitutional because "[a]ll profane or

obscene language, sacred or not, is prohibited."  (Def.'s Mot. for Summary Judgment at 18.)

Such reasoning is flawed.  First, even if Defendant was correct that the Blasphemy Statute only

restricts obscenity and profanity – which it does not – the Supreme Court has made clear that

both of these types of speech are afforded constitutional protection.[25]

Second, as discussed in the Establishment Clause analysis above, Defendant's proffered

justification fails to account for the fact the statute on its face does not actually say what

Defendant would have it say.  The Blasphemy Statute does <u>not</u> state that it prohibits language

that is merely profane or obscene, but instead, it restricts corporate names that contain

blasphemy, profane cursing or swearing, or that profane the Lord's name.  To accept Defendant's

argument that the Blasphemy Statute merely prohibits "<u>all</u> profane or obscene language, <u>sacred or</u>

<u>not</u>," the Court would be required to close its eyes to the statute's actual words and application,

and instead, consider the statute in a vacuum devoid of both logic and common sense.  While the

statute's broad scope may incidentally cover some offensive speech, it is clear that the

Blasphemy Statute is aimed at restricting – and does actually restrict – speech that is irreverent

and disrespectful to religion.  Thus, the Court finds that the Blasphemy Statute does not, as

Defendant argues, prohibit all names with profane or obscene language; to the contrary, it only

---

[25]Even if the Blasphemy Statute did reach speech that is profane or obscene, such a justification would still not be a valid reason for suppressing speech in the present case.  As previously explained, the Supreme Court's definition of obscenity confines the term to a sexual context not present here, <u>see</u> <u>Miller</u>, 413 U.S. at 23-24, and profane words that are "unaccompanied by any evidence of violent arousal [ ] are not 'fighting words,' and are therefore protected speech," <u>Johnson</u>, 332 F.3d at 212 (citing <u>Cohen</u>, 403 U.S. at 20).

restricts speech that is irreverent to religious ideals.

For a statute that is content- or viewpoint-based to survive strict scrutiny, the government must show that the "regulation is necessary to serve a compelling state interest[,] and that it is narrowly drawn to achieve that end." Rappa, 18 F.3d at 1053 (quoting Boos, 485 U.S. at 321); see also Riel, 485 F.3d at 743 (quoting same).  The Court finds that Defendant has failed to meet this burden.  Even assuming that a compelling state interest exists, the Court finds that the Blasphemy Statute is not narrowly drawn to achieve Defendant's proffered purpose, but instead, is far more extensive than necessary to meet Defendant's stated interest.  The Blasphemy Statute's restrictions sweep beyond words that are merely obscene or profane, and reach words that are irreverent to something held sacred – regardless of whether the words are obscene, profane, vulgar, or even remotely offensive.  Because the Blasphemy Statute is not narrowly tailored to meet Defendant's stated purposes, it fails to meet strict scrutiny.

Additionally, where "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship," City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 763 (1988), "[t]his danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official," id. (emphasis added).  The Supreme Court has "often and uniformly held that such statutes or policies . . . are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."  Id. at 763-74.  "[T]he success of a facial challenge [to a statute] on the grounds that [the statute] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a

content-based manner, <u>but whether there is anything in the ordinance to prevent him from doing so</u>." <u>Forsyth County</u>, 505 U.S. at 133 n.10 (emphasis added).

This reasoning applies in the present case, where Bureau employees are left with "unbridled discretion" to determine, in the absence of any standards, training, education, or guidance, which corporate names survive or fail the Blasphemy Statute, and thus "who may speak and who may not based upon the content of the speech or the viewpoint of the speaker." <u>City of Lakewood</u>, 486 U.S. at 763. Mr. Decker testified that he interpreted the Blasphemy Statute based upon his Catholic upbringing and the standards of the Catholic religion (Decker Dep. 27:10-29:7, 40:4-40:9), that he has never received any training or education on any religions other than Catholicism, and that he does not know what might be considered blasphemous in any religion other than Catholicism (Decker Dep. 39:8-39:23). Mr. Decker further testified that he thinks he rejected Plaintiff's application containing the words "I Choose Hell," because, without consulting his supervisor, he likely found the name blasphemous. (Decker Dep. 50:7-54:5.) Clearly, the Blasphemy Statute gives Bureau employees like Mr. Decker unbridled discretion to accept or reject speech based on the content of the speech or the viewpoint of the speaker – and there is "nothing in the [statute] to prevent him from doing so." <u>Forsyth County</u>, 505 U.S. at 133 n.10.

In reaching its conclusion, the Court is aware of Chief Justice Roberts' concurrence in <u>Citizens United v. Fed. Election Comm'n</u>, in which he stated that judging the constitutionality of a statute is "the gravest and most delicate duty" that a Court is called upon to perform. -- U.S. --, 130 S.Ct. 876, 917-18 (2010) (Roberts, C.J., concurring) (quoting <u>Blodgett v. Holden</u>, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring)). Nevertheless, the Supreme Court long ago made

clear that "this court may not, and should not, hesitate to declare [legislative] acts . . . to be unconstitutional if beyond all rational doubt it finds them to be so."  United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 237 (1936).

Given the Court's conclusion that the Blasphemy Statute violates the Free Speech Clause because it unconstitutionally restricts speech on the basis of viewpoint, and in light of the foregoing analysis, the Court will not address the parties' arguments regarding the issues of overbreadth, vagueness, and prior restraint.  See United Yellow Cab Drivers Ass'n, Inc. v. Safir, 2002 WL 461595, at *10 (S.D.N.Y. Mar. 22, 2002) ("[B]ecause this Court has determined that plaintiffs established a violation of their rights under the time, place and manner restriction doctrine, this Court need not reach the issue of prior restraint"); City of Erie v. Pap's A.M., 529 U.S. 277, 286 (2000) ("Because the [lower court] determined that [certain] provisions of the ordinance violated [the] right to freedom of expression under the United States Constitution, [the lower court] did not address . . . the claim that the ordinance is unconstitutionally overbroad."); Gralike v. Cook, 191 F.3d 911, 916 (8th Cir. 1999) ("[T]he district court did not reach plaintiff-appellee's Due Process vagueness claim because it determined that the other three claims were sufficient to dispose of the case.").

### c.    Speech Forum Doctrine

Finally, the Court briefly addresses Defendant's argument that the "speech forum doctrine" applies in this case.[26]  It is true that typically, at the onset of a court's First Amendment

---

[26]The Third Circuit recently considered this issue in a different context in United States v. Marcavage,-- F.3d --, 2010 WL 2384839 (3d Cir. June 16, 2010).  Here, Plaintiff argues that the Court need not employ a speech forum analysis because a corporate name is not speech occurring on "government" property.  Because the Court is not basing its ruling on an analysis of the speech forum doctrine, it will leave the resolution of this question for another day.  Even still, the factual context of

analysis, a court would conduct a speech forum doctrine analysis to determine if certain speech

occurs in a traditional public forum, a designated public forum, or a non-public forum.  See

Whiteland Woods, L.P. v. Twp. of W. Whiteland, 193 F.3d 177, 183 (3d Cir. 1999)

("Traditionally, the speech forum doctrine applies to 'expressive' or 'speech' activity.").  The

Supreme Court has adopted the speech forum doctrine "as a means of determining when the

Government's interest in limiting the use of its property to its intended purpose outweighs the

interest of those wishing to use the property for other purposes."  Cornelius v. NAACP Legal

Def. and Educ. Fund, Inc., 473 U.S. 788, 800 (1985).  "In most instances, an inquiry into whether

challenged restrictions on speech rise to the level of a constitutional violation turns on the nature

of the government property on which expression is restricted."  Children First Found., 2010 WL

1408323, at *2 (non-precedential).

However, because the Blasphemy Statute impermissibly restricts speech based on

viewpoint, the Court need not reach this issue, as "[v]iewpoint discrimination, of course, is

impermissible regardless of the nature of the forum."  Student Coal. for Peace v. Lower Merion

Sch. Dist. Bd. of Sch. Directors, 776 F.2d 431, 438 (3d Cir. 1985) (emphasis added) (citing

Cornelius, 473 U.S. at 811-12); see also Roach v. Stouffer, 560 F.3d 860, 868 n.4 (8th Cir. 2009)

("We would normally conduct a forum analysis at this point . . . .  However, because we find that

---

vanity license plates – a context discussed by the parties in their briefing – may shed light on this
question.  Indeed, vanity license plates are similar to a corporate name in that both entail a private
speaker speaking through a medium which requires initial governmental approval.  (There are
differences, however:  a license plate is the physical property of the government, whereas a corporate
name does not actually exist as anyone's physical property.)  Nevertheless, courts have found that vanity
license plates entail speech occurring in a nonpublic forum.  See, e.g., Perry v. McDonald, 280 F.3d 159,
168-69 (2d Cir. 2001) ("[W]e hold that Vermont has not intended to designate . . . its vanity [license]
plates as a public forum.  Accordingly, we [find] that a Vermont vanity plate is a nonpublic forum.").

the statute unconstitutionally failed to provide standards or guidelines to prevent viewpoint

discrimination, we need not reach the issue."); Children First Found., 2010 WL 1408323, at *2

(non-precedential) ("Forum analysis does not apply to restrictions on expression that are based

on a speaker's viewpoint.  Such restrictions have long been held to be presumptively

unreasonable regardless of the forum involved." (emphasis added)); Sons of Confederate

Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles, 288 F.3d 610, 622 (4th Cir. 2002)

(noting that where private speech is at issue, restrictions must be viewpoint neutral regardless of

type of forum); Planned Parenthood of S. Carolina Inc. v. Rose, 361 F.3d 786 (4th Cir. 2004)

(same).

Even if the Court were to apply the speech forum doctrine in the present case, the Court

would still find that the Blasphemy Statute is unconstitutional.  The Supreme Court has identified

three types of speech fora:  (1) traditional public,[27] (2) designated public,[28] and (3) nonpublic.[29]

---

[27]A "traditional" public forum is public property that "by long tradition or by government fiat . . . has been devoted to assembly and debate," such as a public street or square.  Perry Educ. Ass'n, 460 U.S. at 45.  Speech in a traditional public forum is afforded maximum constitutional protection.  McTernan v. City of York, Pa., 564 F.3d 636, 645 (3d Cir. 2009).  "Accordingly, 'government regulation of speech in a traditional public forum is subject to strict scrutiny and will only be upheld if narrowly tailored to serve a compelling governmental interest.'" Id. at 645 (quoting United States v. Grace, 461 U.S. 171, 177 (1983)).  Thus, speakers may be excluded from an open or traditional public forum only when "necessary to serve a compelling state interest" and when the exclusion is "narrowly drawn to achieve that interest." Cornelius., 473 U.S. at 800.  However, "where the government limits the time, place, or manner of speech in a traditional public forum without reference to the subject matter of the speech or the viewpoint expressed, intermediate scrutiny applies." McTernan, 564 F.3d at 645 (citing Grace, 461 U.S. at 177).

[28]The government may create a "designated" public forum when it "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802.  A designated public forum is "created by purposeful governmental action.  The government does not create a designated public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse . . . ." Whiteland Woods, 193 F.3d at 182 n.2 (citing Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998)).  Designated public forums are subject to the same restrictions as the quintessential public forum.  Pleasant Grove City,  -- U.S. --, 129 S.Ct. at 1132 (citing Cornelius, 473 U.S. 788).  Relatedly, a "limited public forum" – a subcategory of the designated public forum – is created when the government opens a nonpublic forum but limits the expressive

Here, the Court agrees with Defendant that a corporate name would not occur in a traditional public forum (because a corporate name is not akin to a public street or square), or a designated public forum (because a corporate name has not been created by purposeful government action for public discourse).  Thus, if the speech forum doctrine were to apply, the Blasphemy Statute would be analyzed as regulating speech occurring in a nonpublic forum.

As the Supreme Court has explained, "[t]o be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property."  Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 682 (1998) (emphasis added).  Further stated, the government cannot restrict access to a nonpublic forum if such restrictions "suppress expression merely because public officials oppose the speaker's view."  Id. at 677 (quoting Cornelius, 473 U.S. at 800).  Therefore, even if the Court were to apply the speech forum doctrine, the Blasphemy Statute would, for the reasons articulated above, still be unconstitutional because it regulates speech occurring in a nonpublic forum on the basis of viewpoint.

---

activity to certain kinds of speakers or to the discussion of certain kinds of subjects.  Donovan, 336 F.3d at 225.

   [29]All government speech not constituting a public or designated public forum is considered under the rubric of "nonpublic forum" property that "is not by tradition or design a forum for public communication."  Perry Educ. Ass'n, 460 U.S. at 46.  Restrictions on speech within a nonpublic forum must not discriminate on the basis of viewpoint and "must be reasonable in light of the forum's purpose."  Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (citing Cornelius, 473 U.S. at 806).

VI.    __Conclusion__

For the aforementioned reasons, the Court finds that the Blasphemy Statute violates both the Establishment Clause and the Free Speech Clause of the First Amendment to the United States Constitution.  Accordingly, the Court will grant Plaintiff's motion for summary judgment, and deny Defendant's motion for summary judgment.

In so ruling, the Court respects those for whom blasphemy is an important concept, and emphasizes that nothing in this opinion impacts their beliefs.  This opinion only holds that the Blasphemy Statute has constitutional defects, as it impermissibly entangles Bureau employees with religion by requiring them, in their own discretion, to make standardless determinations as to what constitutes blasphemy, profane cursing or swearing, or what profanes the Lord's name, based on nothing but their own individual religious beliefs.  The Court rejects Defendant's argument that the Blasphemy Statute is saved because Defendant revised its list of suspect words by eliminating any words with religious meaning.  Regardless of how the Bureau intends to apply its non-binding internal lists going forward, or how such lists may read at some future date, the statute's glaring constitutional defects remain.

The Supreme Court has explained that the First Amendment affords the general public "access to discussion, debate, and the dissemination of information and ideas," First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1979), and contemplates an "uninhibited, robust, and wide-open debate and discussion," Lamont v. Postmaster General of the U.S., 381 U.S. 301, 307 (1965) (internal quotation marks and citation omitted).  Yet, the Supreme Court has cautioned that "[i]t is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one [or] the other," Rosenberger, 515 U.S. at 321 (1995) (emphasis added), and

has emphasized that the First Amendment "forbids <u>alike</u> the preference of a religious doctrine <u>or</u> the prohibition of theory which is deemed antagonistic to a particular dogma."  <u>Edwards</u>, 482 U.S. at 593 (emphasis in original) (citation omitted).

Pennsylvania's Blasphemy Statute, however, unequivocally excludes <u>only one</u> religious perspective <u>but not the other</u>, as it permits speech deemed reverent to religious beliefs, yet excludes speech deemed irreverent to religious beliefs.  "Choosing hell" may be an irreverent choice for a corporate name, but under the Constitution, this fact alone cannot be the basis for its suppression from the public debate.  Consequently, the Blasphemy Statute is "alien to the tradition of disestablishment of which the First Amendment is only a part."  <u>Freethought Soc'y v. Chester County</u>, 194 F. Supp. 2d 437, 441 (E.D. Pa. 2002).  As Judge Dalzell aptly stated, such a tradition "<u>has particular force</u> in the Commonwealth of Pennsylvania, where William Penn's 'holy experiment' included tolerance of competing religious views that was unique in the colonies long before the First Amendment was a gleam in James Madison's eyes."  <u>Id.</u> (emphasis added).

An appropriate Order follows.


A:\Kalman v. Cortes -- SJ Opinion.wpd